CITY OF EVANSVILLE AND AFL-CIO CENTRAL LABOR COUNCIL OF VANDERBURGH, POSEY & WARRICK COUNTIES *v.* SOUTHERN INDIANA GAS AND ELECTRIC COMPANY, AN INDIANA CORPORATION, PUBLIC SERVICE COMMISSION OF INDIANA, W. W. HILL, WILLIAM B. POWERS AND DAVID J. ALLEN, AS MEMBERS OF THE PUBLC SERVICE COMMISSION OF INDIANA, CARL E. VAN DORN, PUBLIC COUNSELOR OF THE STATE OF INDIANA.

[No 272A89. Filed December 30, 1975.]

476

*Paul Hirsch,* of Indianapolis, *Virginia Dill McCarty,* of Indianapolis, *Sydney L. Berger,* of Evansville, *Cox, Schroeder, Dodd, Staser & Mitchell,* of Evansville, for appellants.

*Theodore L. Sendak,* Attorney General, *Leslie Duvall,* of Indianapolis, *Carl E. Van Dorn,* of Indianapolis, *Fred P. Bamberger, Bruce R. Heathcotte, Bamberger, Foreman, Oswald and Hahn,* of Indianapolis, for appellees.

STATON, P.J.—The Southern Indiana Gas and Electric Company [Petitioner] instituted this proceeding on May 7, 1971 before the Public Service Commission [Commission] for the purpose of obtaining an increase in its electric service rates. Petitioner is engaged in the production, distribution and sale of electric power to consumers in the southwestern portion of Indiana. The Petitioner's proposed electric rate schedules were designed to increase its electric operating revenue by $4,898,060.00, and to provide a return on investment of $8,150,429.00. The aggregate amount of proposed rate increase for all classes was 16.8 percent.

Before the formal hearings on the rate increase, the City of Evansville [City] and the AFL-CIO Central Labor Council of Vanderburgh, Posey and Warrick Counties [council] petitioned for leave to intervene in Petitioner's rate proceeding. The Commission granted both intervention petitions, and the Intervenors actively participated in the formal hearings conducted by the Commission during October and November of 1971. On January 28, 1972, the Commission issued its final rate order, which increased Petitioner's rate income to $8,021,405.00 The Commission's order resulted in an aggregate rate increase of approximately 16 percent.

The City and the Council have joined in initiating this appeal for a review of the Commission's order. Appellate jurisdiction is predicated upon IC 1971, 8-1-3-1 to -12 (Burns Code Ed.), which authorizes "[a]ny person, firm, association, corporation, city, town or public utility adversely affected by

any final decision, ruling, or order . . ." of the Commission to seek judicial review in this Court. IC 1971, 8-1-3-1 (Burns Code Ed.).

We affirm in part and remand with instructions for further proceedings consistent with this opinion.

## I.

### RATE METHOD

To place the issues raised by this appeal in perspective, it is necessary to provide the reader with some background on the methodology of rate regulation. The Commission's primary objective in every rate proceeding is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. IC 1971, 8-1-2-4 (Burns Code Ed.) ; *Federal Power Comm'n* v. *Hope Natural Gas Co.* (1944), 320 U.S. 591, 605, 64 S.Ct. 281, 88 L.Ed. 333. Accordingly, the initial determination that the Commission must make concerns the future revenue requirement of the utility. This determination is made by the selection of a "test year"— normally the most recent annual period for which complete financial data are available—and the calculation of revenues, expenses and investment during the test year.[1] The test year concept assumes that the operating results during the test period are sufficiently representative of the time in which new rates will be in effect to provide a reliable testing vehicle for new rates.

The utility's revenues minus its expenses, exclusive of interest, constitute the earnings or the "return" that is available to be distributed to the utility's investors.[2] Allowable operating costs include all types of operating expenses (e.g., wages, salaries, fuel, maintenance) plus annual charges for

---

1. J. BONBRIGHT, PRINCIPLES OF PUBLIC UTILITY RATES 149-51 (1961).

2. J. BONBRIGHT, *supra* note 1, 149; 1 A. PRIEST, PRINCIPLES OF PUBLIC UTILITY REGULATION 45-46 (1969).

depreciation and operating taxes. While the utility may incur any amount of operating expense it chooses, the Commission is invested with broad discretion to disallow for rate-making purposes any excessive or imprudent expenditures. IC 1971, 8-1-2-48 (Burns Code Ed.).

Test-year revenue and expense data, however, may not always provide a suitable basis for determining rates. Because of abnormal operating conditions such as unusual weather or a typical equipment outages, test-year revenues and expenses or both may not faithfully reflect normal conditions. If test-year results are unrepresentative, appropriate adjustments must be made to correct for the effects.[3] This type of adjustment is commonly labeled an "in-period adjustment." Since test-year results are relevant for a determination of utility rates only to the extent that past operations are representative of probable future experience, further adjustments are usually necessary to account for changed conditions not reflected in test-year data. For example, if future operations will be required to bear higher tax rates or higher levels of wages and salaries than were incurred during the test year, test-year data must be adjusted to reflect increased costs. This type of an adjustment to test-year data is usually referred to as an "out-of-period adjustment."

After the utility's existing level of earnings or "return" is established, the amount of investment in utility operations— the "rate base"—is determined by adding the net investment in physical properties to an allowance for working capital.[4] The "rate base" consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the "return" is to be earned. Since traditional rate-making methodology utilizes the "historical" test year, the "rate base" is usually defined as that utility property "used and useful" in rendering the particular utility service. IC 1971, 8-1-2-6

---

3. See 1 A. PRIEST, *supra* note 2, at 47-51.
4. J. BONBRIGHT, *supra* note 1, at 173-74.

(Burns Code Ed.). The property included in the "rate base" may be valued by one of two standard methods: (1) the "original cost" method, which is based on book value (the cost of an asset when first devoted to public service), or (2) the "fair value" method, which takes into account the declining purchasing power of the dollar through "reproduction cost new" studies utilizing price indices or other measurements of an investment's current value.[5] The Indiana statutory scheme authorizes the use of either valuation method. IC 1971, 8-1-2-6 (Burns Code Ed.).

After existing levels of "return" and "rate base" are determined, the Commission must decide whether the "rate of return," the ratio of "return" to "rate base," is deficient, adequate, or excessive. The generally accepted method for establishing a comparative basis to determine the adequacy or excessiveness of the utility's existing "return" is the "cost of capital" approach. The Commission first examines the utility's capital structure to identify the sources of the utility's capital; the capital structure of an average electric utility might consist of 50 percent debt, 15 percent preferred stock and 35 percent common stock.[6] The Commission then ascertains the cost of each capital component: (1) the cost of debt, determined by comparing the utility's annual interest requirements with the proceeds from utility bond sales; (2) the cost of preferred stock, determined by comparing the stated dividend requirements on outstanding preferred stock with the proceeds from preferred stock sales; (3) the cost of common stock, determined by the return required to sell such stock in prevailing capital markets. After these preliminary determinations are made, the Commission calculates a composite "cost of capital" by taking a weighted average of the cost of each capital component. The composite cost of capital, when expressed as a percentage of the utility's combined debt and equity accounts, is then

5. 1 A. PRIEST, *supra* note 2, at 140, 156-66.
6. J. BONBRIGHT, *supra* note 1, at 243-44.

compared with the utility's existing rate of return, and thus serves as an initial point of reference in establishing a "fair rate of return" for utility operations. The United States Supreme Court has delineated the legal criteria for determining a "fair rate of return." In *Bluefield Waterworks & Improvement Co.* v. *Public Serv. Comm'n* (1923), 262 U.S. 679, 692-93, 43 S.Ct. 675, 679, 67 L.Ed. 1176, the Court stated:

> "What annual rate will constitute just compensation depends upon many circumstances and *must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts.* A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."

The "fair rate of return" is usually the final subsidiary issue that the Commission resolves in determining the utility's revenue requirement. After considering all other issues, many regulatory agencies frequently employ the rate of return component as a "balance wheel" to provide a limited margin of error for the resolution of other issues. *See* Jones, JUDICIAL DETERMINATION OF UTILITY RATES: A CRITIQUE, 54 B.U.L. REV. 873, 875-83 (1964). The Commission's primary objective is to reach an overall result that is equitable and that will permit continuity of utility services on a sound financial basis. IC 1971, 8-1-2-4 (Burns Code

Ed.) ; *Federal Power Comm'n* v. *Hope Natural Gas Co.* (1944), 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

While this brief summary may indicate that determining a utility's revenue requirement is a simple, almost mechanical task, the process actually requires extensive examination of the utility's operations and continuing exercises of informed administrative judgment.[7] Throughout the remainder of this opinion, two crucial facts about the rate-making methodology should be observed. First, the determination of a utility's revenue requirement is primarily an exercise in informed regulatory judgment. Second, if that judgment is to be exercised properly, the Commission must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years.

## II.
## STANDARD OF REVIEW

The appropriate standard of judicial review for the Commission's factual determinations is prescribed by statute. IC 1971, 8-1-3-1 (Burns Code Ed.) provides a two-tier standard of review:

"An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the findings of facts upon which it was rendered."

---

7. Professor Charles Phillips, an economist, has constructed a simple mathematical formula for the expression of a utility's total revenue requirement:

$$R = O + (V-D)r$$

where
R — Is the total revenue required,
O — is the operating costs,
V — is the gross value of the tangible and intangible property,
D — is the accrued depreciation of the tangible and reproducible property, and
r — is the rate of return."

C. PHILLIPS, THE ECONOMICS OF REGULATION 131 (1965).

At the first level of review, the statutory standard requires that the Commission's decision contain specific findings on all the factual determinations material to its ultimate conclusions. *General Tel. Co.* v. *Public Serv. Comm'n* (1958), 238 Ind. 646, 150 N.E.2d 891; *Fred J. Stewart Trucking, Inc.* v. *Bunn Trucking Co.* (1972), 151 Ind. App. 157, 278 N.E.2d 310; *Daviess-Martin County Rural Tel. Corp.* v. *Public Serv. Comm'n* (1961), 132 Ind. App. 610, 174 N.E.2d 63. The requirement that an administrative agency illuminate its decision-making process with specific findings of the basic facts upon which its decision is based has been extensively discussed in recent opinions of this Court. *See, e.g., Bendix Corp.* v. *Radecki* (1973), 158 Ind. App. 370, 302 N.E.2d 847. The policies underlying the "basic findings" requirement apply with special force to Commission rate orders. The legislative scheme which delegates to the Commission its rate-making authority merely requires that the rates and charges established be "reasonable and just." IC 1971, 8-1-2-4 (Burns Code Ed.). Since the Commission operates without the benefit of legislative guidance, it must attempt to formulate general standards of rate-making policy on an *ad hoc* case-by-case basis. Moreover, the rate-making function involves innumerable technical determinations which are peculiarily within the Commission's competence and expertise. When the Commission provides the reviewing court with basic findings of fact on all issues material to its decision, its expert reasoning process and subtle policy judgments provide an intelligible framework for the judicial non-expert. Since "basic findings" afford a rational and informed basis for review, the danger of judicial substitution of judgment on complex evidentiary issues and policy determinations is substantially reduced. *See Hancock Rural Tel. Corp.* v. *Public Serv. Comm'n* (1964), 137 Ind. App. 14, 201 N.E.2d 573. The process of formulating basic findings on all material issues can also serve to aid the Commission in avoiding arbitrary or ill-considered action. "Often a strong impression

that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper." 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 16.05, at 477 (1958), quoting Judge Frank in *United States v. Forness* (2d Cir. 1942), 125 F.2d 928, 942. There is little assurance that an administrative agency has made a reasoned analysis if it need state only ultimate findings or conclusions.

The second level of factual review prescribed by IC 1971, 8-1-3-1 (Burns Code Ed.) requires a reviewing court to inquire whether there is substantial evidence in light of the whole record to support the Commission findings of basic fact. *Boone County Rural Elec. Membership Corp.* v. *Public Serv. Comm'n* (1959), 239 Ind. 525, 159 N.E.2d 121; *City of Terre Haute* v. *Terre Haute Water Works Corp.* (1962), 133 Ind. App. 232, 180 N.E.2d 110. While IC 8-1-3-1 contains no specific reference to the "substantial evidence" test, the statute has been consistently interpreted to authorize reviewing courts to set aside Commission findings of fact which are unsupported, on the whole record, by substantial evidence. *See, e.g., Pennsylvania R. R. Co.* v. *Town Board of Trustees* (1966), 139 Ind. App. 216, 218 N.E.2d 171; *Knox County Rural Elec. Membership Corp.* v. *Public Serv. Co.* (1966), 139 Ind. App. 547, 213 N.E.2d 714. Moreover, the Indiana Supreme Court has clearly indicated that the "substantial evidence" test encompassed by the statute is not a hybrid standard formulated specifically for review of Public Service Commission decisions, but it is a standard from federal and state common law principles governing judicial review of administrative action. In *Public Serv. Comm'n* v. *City of Indianapolis* (1956), 235 Ind. 70, 80-81, 131 N.E.2d 308, 312, Justice Arterburn explained the derivation of Indiana's "substantial evidence" standard of judicial review:

"This rule regarding 'substantial evidence' is one adopted by the Supreme Court of the United States in Florida v. United States (1934), 292 U.S. 1, 12, 54 Sup. Ct. 603, 608, 78 L.Ed. 1077, where the court said:

'. . . its (commission's) findings of fact supported by substantial evidence are not subject to review. It is not the province of the court to substitute their judgment for that of the commission.' "

Judicial attempts to define the meaning of substantial evidence have met with less than unqualified success. A principal guide to the content of this elusive concept has been a statement by Chief Justice Hughes:

"Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co.* v. *NLRB* (1938), 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126.

Another statement of the United States Supreme Court provides some additional clarification: Substantial evidence "means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. . . ." *NLRB* v. *Columbian Enameling & Stamping Co.* (1939), 306 U.S. 292, 299, 59 S.Ct. 501, 505, 83 L.Ed. 660. Professor Davis has perhaps provided the best analysis:

"The meaning of 'substantial evidence' is about as clear and about as vague as it should be; the main inquiry is whether on the record the agency could reasonably make the finding. . . . Despite the theory, the judges as a matter of practical fact have a good deal of elbow room to vary the intensity of review as they deem necessary or desirable in particular cases." 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 29.01, at 118 (1958).

From a review of these authorities, we conclude that the substantial evidence standard authorizes a reviewing court to set aside Commission findings of fact when a review of the whole record clearly indicates that the agency's decision lacks a reasonably sound basis of evidentiary support. *See Universal Camera Corp.* v. *NLRB* (1951), 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456.

Some additional clarification of our standard of review formula is necessary. It is well established that the sub-

stantial evidence test cannot be utilized to assay the "reasonableness" of the conclusions of ultimate fact inferred by an agency from its findings of basic fact. *See, e.g., NLRB* v. *Babcock & Wilcox Co.* (1956), 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975; *NLRB* v. *Truitt Mfg. Co.* (1956), 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027. Ultimate facts may be described generally as factual conclusions derived from the basic facts; they are often expressed in terms of statutory criteria such as "fair value" or "used and useful." Since findings of ultimate fact represent inferences drawn by the agency, they are not susceptible to scrutiny for evidentiary support in the record, but the reasonableness of the agency's inference is a question appropriate for judicial determination—a "question of law."

It is equally well settled that in determining the "substantiality" of the evidence, the reviewing court must consider the evidence in opposition to the challenged finding of basic fact as well as the evidence which tends to support the finding. As Justice Frankfurter said: "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp.* v. *NLRB* (1951), 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L. Ed. 456.

## III.

## OUT-OF-PERIOD ADJUSTMENTS AND FUTURE TEST YEAR

On June 25, 1971, the Commission held a prehearing conference for the purpose of establishing a test-period for accounting and engineering evidence. At the close of the prehearing conference, the Commission entered an order which established a twelve month period ending on June 30, 1971 as an appropriate test period for determining the Petitioner's revenues, expenses and rate base. The prehearing order also provided that:

"The accounting method to be utilized in the preparation of financial statements to be introduced into evidence in this

cause shall be computed on the 'going level' basis, further limited to adjustments that are known, fixed and measurable within twelve months of June 30, 1971, except that real and personal property tax calculations may include two pro forma years for expense determination."

Throughout this proceeding the Commission interpreted this provision of its prehearing order to authorize "out-of-period" adjustments to test-year data based on "known, fixed and measurable" events that could be presumed to occur within twelve months of the test-period termination date. While neither the Commission's final order nor its prehearing order specify the "out-of-period" adjustments which were actually utilized in determining the Petitioner's revenue requirement, it would appear from the record that all the adjustments contained in Petitioner's Exhibit D-I were accepted by the Commission. These adjustments included: (1) projected future increases in wage and salary expense, FICA tax expense, insurance expense, postal expense and employee group medical expense; (2) projected future increase in operating expense resulting from replacement of 340,991,000 kilowatt hours of power, which was partially purchased at wholesale and partially generated by Gas Turbine plant during the test year, with power to be generated by new Warrick No. 4 plant; and (3) increases in future rate base resulting from the addition of a substantial portion of Petitioner's generating plant which had been devoted to non-jurisdictional (wholesale) operations during the test year. These and other adjustments to test-year data will be discussed later; however, these out-of-period adjustments are illustrative of the types of adjustments which were authorized by the Commission.

The City has challenged the validity of the Commission's adjustment method on two grounds. First, the City argues that the adjustments made were mere "estimates," and could not be considered in arriving at Petitioner's revenue requirement since they failed to comply with the prehearing order's mandate that adjustments be based on "known, fixed and measurable" events. Thus, City contends that it was improper

for the Commission to consider the testimony of Petitioner's expert witnesses concerning the projected expense data utilized to formulate the adjustments.

The true import of the City's first contention can be illustrated with a specific example. The Petitioner's Warrick Power Plant, Unit No. 4, did not commence commercial operations until December, 1970, only six months prior to the test period termination date on June 30, 1971. Since operating and maintenance expense data were available for only six months of the test year, Petitioner's expert witnesses projected the expense data for a full year of operations using estimates derived from both the historical data and predictions of future operations. Acceptance of the City's argument would require the Commission to ignore this particular item of future operating expense because it was at least partially based on estimates of future expenses.

The Public Service Commission Act imposes no requirement that the data utilized by the Commission be wholly derived from historical information. On the contrary, the Act invests the Commission with broad discretionary authority to formulate the accounting systems and adjustment methods best suited to its particular needs. IC 1971, 8-1-2-47; *Boone County Rural Elec. Membership Corp.* v. *Public Serv. Comm'n* (1959), 239 Ind. 525, 159 N.E.2d 121. The City's challenge to the adjustment method adopted by the Commission constitutes an attack on the propriety of the agency's regulatory policy-making authority delegated by the Act. Such a challenge presents no issue for evidentiary review; the appropriate standard of review for "questions of law" concerning Commission-formulated standards of regulatory policy is one of reasonableness. *Public Serv. Comm'n* v. *Indiana Bell Tel. Co.* (1956), 235 Ind. 1, 130 N.E.2d 467; *Public Serv. Comm'n* v. *City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308. We must reject the City's assertion that the adoption of an adjustment method allowing the use of estimated data is not reasonably related to the Commission's

primary objective of obtaining the most accurate representation of Petitioner's future operations. The expert use of estimates is an integral part of the rate-making process. The Indiana Supreme Court, in recognizing the need for estimated data, has stated:

"Estimates of the Commission can only be reasonable approximations. No one can know with exactitude what the future holds. The rate making process involves a balancing and weighing of many factors, including general economic and business conditions of the future period and its affect on other estimates." *Boone County Rural Elec. Membership Corp.* v. *Public Serv. Comm'n, supra,* 239 Ind. at 535, 159 N.E.2d at 125.

Therefore, the Commission's decision to include such estimated data is not *per se* unreasonable.

The City's second challenge to the test-year and the adjustment method selected by the Commission is broader in scope. In essence, the City contends that the test-year and the adjustment method established by the Commission were not reasonably related to its primary statutory duty of determining "reasonable and just" rates. IC 1971, 8-1-2-4 (Burns Code Ed.). The City asserts that the test-year and adjustment method used by the Commission resulted in an inaccurate and misleading representation of Petitioner's operations. Throughout the proceedings, the City urged the Commission to employ projected revenue, expense and rate base data derived from estimates of future operations. The City contended that the year-end rate base accepted by the Commission, with additional adjustments which increased the rate base to reflect plant coming "on line" within twelve months after the test year, wholly negated the predictive value of the historical test-period data. The City pointed out that a large portion of Petitioner's resulting rate base was composed of new plant or plant recently devoted to jurisdictional operation for which accurate historical revenue and expense data were unavailable. Furthermore, the City argued that the alleged inadequacy of the revenue, expense

and rate base data utilized by the Commission rendered its method of adjustment for future changes ineffective as a reliable measurement device. The City contended that the Commission's method of making isolated or piecemeal adjustments was improper since the effect of future changes in operations could not be reliably predicted from the historical test-year data.

The City advocated the use of a future or projected test year as an alternative to the "year-end" or historical test year, adjusted for known changes, adopted by the Commission. The City asserted that the rapidly changing nature of Petitioner's jurisdictional operations caused by rapid expansion, wide variances in plant efficiency, and projected increases in consumer demand required that the test year be projected forward into a more representative future period.

The theory underlying the use of any test year and of any adjustment method in the rate-making process demands that the data used provide an accurate picture of the utility's operations during the period in which the proposed rates will be in effect. The test year may be analogized to the technique of stopping a motion picture of a utility in action to examine one isolated frame. By stopping the action of the utility's operations in a convenient time frame, the Commission can observe the inherent interrelationships among rate base, expenses and revenues. This observation is crucial to the concept of the test period because a complete picture of these dynamic interrelationships can only be obtained when the rate base, expense and revenue components are examined in phrase. Thus, rate base, expense and revenue data for an historical test year are meaningful for a determination of utility rates only insofar as past operations are representative of probable future experience. Significant changes in a utility's operating structure, such as rapid plant expansion, may render even the most current historical data inadequate as a basis for predicting the results of future operations.

Even the ameliorative technique of adjusting test-year figures to reflect changes that have occurred or will occur subsequent to an historical test period may be inadequate when the test-period data are themselves fundamentally unrepresentative. These adjustments, being by definition piecemeal, often accomplish little in meeting the overall effects of rapid expansion or significant shifts in consumer demand. The sheer complexity of the adjustment process can affect the reliability of the results achieved; an adjustment to rate base for new plant will invariably necessitate further complicated adjustments to revenue and expense data. This factor alone has discouraged many regulators from authorizing any adjustments at all. When requested to make an adjustment in a utility's test-year revenues to reflect the loss of a large industrial customer, the Colorado Public Utilities Commission stated:

> "Normally, the test year is adjusted to take care of known changes within said test year to reflect these changes for the entire period of the test year. When something occurs after the test year, it is unfair to the company or the customer, if a single or a few particular items are adjusted without making adjustments for all changes that have occurred subsequent to the test year. In other words, if an adjustment is to be made out of period, perhaps the fairest method to follow is, in effect, to move the date of the test year to a new period of time and again make all adjustments for known changes in the new period." *In re Southern Union Gas Co.* (1963 Colo. Pub. Util. Comm'n), 50 P.U.R.3d 350, 360.

Other regulatory commissions have rejected methods which adjust only for selected changes on the ground that such adjustments destroy the usefulness of the test year as a vehicle for simultaneous observation of the interrelationships between rate base, expenses and revenues. *See, e.g., In re Rochester Gas & Elec. Corp.* (1971 N.Y. Pub. Serv. Comm'n), 88 P.U.R.3d 271; *In re New Haven Water Co.* (1970 Conn. Pub. Util. Comm'n), 84 P.U.R.3d 428.

While under some circumstances historical data may pro-

vide a distorted approximation of a utility's operations, the reliability of the projected or future test-year method advocated by the City has been widely disputed. Some regulatory commissions have accepted projected data and future estimates in determining the propriety of proposed rates. *See, e.g., In re Powell Tel. Co.* (1970 Tenn. Pub. Serv. Comm'n), 85 P.U.R.3d 124; *In re Elizabethtown Water Co.* (1969 N.J. Bd. of Pub. Util. Comm'rs), 77 P.U.R.3d 515; *In re Jacksonville Gas Corp.* (1961 Fla. R.R. & Pub. Util. Comm'n), 37 P.U.R.3d 433. But even those commissions utilizing the future test year have expressed concern about the reliability of projected data, and many have limited its use to cases in which unusual circumstances rendered existing historical data clearly inadequate. *See e.g., In re Mountain States Tel. & Tel. Co. Co.* (1969 Utah Pub. Serv. Comm'n), 78 P.U.R.3d 429; *In re Michigan Gas & Elec. Co.* (1958 Mich. Pub. Serv. Comm'n), 24 P.U.R.3d 278. The future test year has been most frequently used in rate proceedings involving utilities which have undergone rapid capital expansion or have experienced some substantial shift in operating structure. *See, e.g., In re Rochester Gas & Elec. Corp.* (1971 N.Y. Pub. Serv. Comm'n), 88 P.U.R.3d 271 (50 percent increase in rate base); *In re Jacksonville Gas Corp.*, (1961 Fla. R.R. & Pub. Util. Comm'n), 37 P.U.R.3d 433 (conversion from manufactured gas to natural gas). On the other hand, some regulatory agencies have decided that the data forecasts of the future test-year method are so inherently unreliable that they should never be considered in rate proceedings. *See, e.g., In re Southern Connecticut Gas Co.* (1969 Conn. Pub. Util. Comm'n), 81 P.U.R.3d 289; *In re Pennichuck Water Works* (1969 N.H. Pub. Util. Comm'n) 77 P.U.R.3d 347.

In the final analysis, the selection of a test year and the adoption of an adjustment method are complex issues of regulatory policy which must be resolved in light of the special facts of each case. The statutory scheme reflects the basic legislative policy that these ques-

tions of rate-making methodology are best consigned to the Commission's expert judgment. IC 1971, 8-1-2-47. (Burns Code Ed.). The appropriate standard of review therefore limits our inquiry to whether, on the facts of this case, the test-year and adjustment method selected by the Commission were reasonably related to the purpose they were intended to serve—the fixing of "reasonable and just" rates. *Public Serv. Comm'n* v. *City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308; *Public Serv. Comm'n* v. *Indiana Bell Tel. Co.* (1956), 235 Ind. 1, 130 N.E.2d 467. This standard of review does not authorize the substitution of judicial judgment on matters committed to Commission discretion nor does it require that the reviewing tribunal concur in the wisdom or correctness of the Commission's decision. Our function of review is limited to a determination that the actual choice made by the Commission was based on a consideration of the relevant factors and was reasonably related to the discharge of its statutory duty. In other words, we must determine that there has been no clear error in judgment, and that the Commission's action is founded upon a reasonable basis of support in the whole record.

We have previously discussed the requirement that an administrative agency illuminate its decision-making process with specific findings upon all material issues. The legal concepts of "questions of fact," "questions of law," and "materiality" cannot, however, furnish adequate guidance in the review of Commission rate decisions. The Commission's policy determinations (legal decisions) are made on a case-by-case basis, and, of necessity, are inextricably intertwined with evidentiary conclusions (factual decisions). The subject matter of the regulatory process is too complex to permit the judicial non-expert any clear insight concerning the legal and factual issues which the Commission thought "material" to its decision. In light of these difficulties inherent in judicial review of rate proceedings, we are compelled to require the Commission to articulate the policy and

evidentiary factors underlying its resolution of all issues which are put in dispute by the parties. *Indianapolis & Southern Motor Express, Inc.* v. *Public Serv. Comm'n* (1953), 232 Ind. 377, 112 N.E.2d 864.

The Commission's treatment of the test-year issue amply illustrates the necessity for some minimal explanation of its decision. The prehearing conference order did not contain any statement of the policy considerations or evidence which motivated the Commission's selection of the test-year and adjustment method challenged by the City. The portion of the prehearing conference devoted to these issues was conducted off the record, and we can only speculate on what evidence was received and considered by the Commission. Neither during the formal hearings nor in the Commission's final written order was any attempt made to articulate the reasons underlying the rejection of the future test-year method advanced by the City. Some minimal record is required on review for a determination that the Commission's historical test-year decision is reasonably related to the discharge of its statutory duty. *See, e.g., American Vitrified Products Co.* v. *Public Serv. Comm'n* (1961), 131 Ind. App. 378, 176 N.E.2d 145. We must remand this porion of proceedings to the Commission for a clear statement of the policy and evidentiary considerations underlying its test-year and adjustment method determinations.

## IV.

### PUBLIC NOTICE

At the formal hearing, the City objected to the admission of Petitioner's Exhibit E, which was offered in support of a proposed upward revision in Petitioner's depreciation rates. The City contended that the Commission lacked the authority to consider any alteration in Petitioner's existing rates of depreciation because the statutorily required public notice of the proceedings did not specifically state that the Petitioner

had requested any change in depreciation rates.[8] The commission overruled the City's objection and admitted Petitioner's evidence in support of its request; the Commission's final order granted the proposed increase in depreciation rates. In rejecting the City's contention, the Commission asserted that a change in depreciation rates was "an inherent and integral part" of a general rate increase proceeding, and therefore the public notice required by statute need not "reflect or disclose that the Petitioner is applying for a change in depreciation rates." *Record* at 1349.

The Public Service Commission Act provides that:

"Whenever any public utility shall file a complaint or petition as to any matter concerning an increase of its own rates, affecting its patrons in any county in which such public utility renders service, the public utility shall publish a notice of the filing of such petition or complaint in a newspaper of general circulation published in such county." IC 1971, 8-1-2-61 (Burns Code Ed.).

The public notice published by Petitioner, and approved in advance by the Commission, stated:

"In the Matter of the Petition of Southern Indiana Gas and Electric Company for the Approval of New Schedules of Rates for Electric Service."

While it is apparent that IC 8-1-2-61 contains no explicit guidelines governing the content and specificity of the required public notice, the City argues that such a guideline is implicit in the statutory mandate that public notice be given whenever a utility files a "petition as to any matter concerning an increase of its own rates." The City construes this provision to require specific public notice of all matters to be con-

---

8. The City's argument is premised on the assumption that the "jurisdiction [of the Commission] only attaches to those matters set forth in the [public] notice." *Appellant's Brief* at 1251. In light of our construction of IC 1971, 8-1-2-61, we find it unnecessary to consider whether the Act's public notice requirement constitutes an independent limitation on the Commission's authority to grant the regulatory relief requested after a hearing on the merits demonstrates petitioner's entitlement to such relief. *Cf. City of New Haven* v. *Indiana Suburban Serers, Inc.* (1972), 257 Ind. 609, 277 N.E. 2d 361 (similar statutory notice provision held unrelated to Commission's subject-matter jurisdiction).

sidered by the Commission which might ultimately effect an increase in Petitioner's rate structure. Therefore, the City contends that the Petitioner's request for an increase in depreciation rates could independently increase rates; IC 8-1-2-61 requires specific public notice of Petitioner's attempt to increase the authorized amount of its depreciation expense.

The Public Service Commission Act invests the Commission with broad authority "to adopt and publish reasonable and proper rules to govern its proceedings." IC 1971, 8-1-2-47 (Burns Code Ed.). Pursuant to its rulemaking authority, the Commission has adopted Rule of Practice and Procedure 8(b):

"The caption of the petition shall describe in general terms all the relief being sought in the petition." Ind. Admin. Rules & Regs. § (54-401)-8(b) (Burns Supp. 1975).

While Rule 8(b) does not specifically state that the caption of a petition will determine the content of the public notice required by the Act, the record discloses that it is the Commission's general practice in rate proceedings to publish the caption as adequate public notice of the petition's **contents.** Thus, the Commission has adopted the position that the caption of a petition which satisfies the specificity requirement of its Rule 8(b) will also serve as adequate public notice of the contents of the petition for purposes of the Act's notice requirement. The Commission's established practice was followed in this proceeding; the caption of Petitioner's general rate increase request was used as the sole criterion for determining the content of the public notice given.

A review of the statutory scheme clearly indicates that the case-by-case determination of what constitutes adequate public notice has been legislatively committed to the Commission's informed discretion. It is well established that an agency's interpretation of the statutory scheme it administers is entitled to judicial deference, especially when the legislative plan necessarily con-

templates administrative rule elaboration. *See, e.g., State ex rel. Blair v. Gettinger* (1952), 230 Ind. 588, 105 N.E.2d 161·; *Parvin v. Wimberg* (1891), 130 Ind. 561, 30 N.E. 790. We conclude that, as a general construction of IC 8-1-2-61, the Commission's Rule 8(b) is reasonably related to the basic legislative objective of providing ratepayers with notice sufficient to inform them of the possible adverse consequences of proposed Commission action. *State ex rel. Public Serv. Comm'n v. Boone Circuit Court* (1956), 236 Ind. 202, 138 N.E.2d 4. The complexity and varied nature of regulatory proceedings militate against the adoption of a more particularistic notice standard; the Commission's Rule 8(b) provides the flexibility necesary for case-by-case determinations of the appropriate content of the public notice to be published.

We reject the City's contention that IC 8-1-2-61 must, in all cases, be construed to require specific public notice of all regulatory issues whose ultimate resolution might independently effect an increase in a utility's rates. If we were to interpret the Act to require specific public notice that the Commission will consider the propriety of a Petitioner's depreciation rates, the Commission would be compelled to give additional public notice of its intention to determine the "fair value" of Petitioner's plant and equipment, operating expenses, revenues, cost of capital, working capital needs, etc. While the degree of particularity inherent in the City's construction of the statute's public notice requirement does not render its interpretation *per se* unreasonable, our review is limited to determining the reasonableness of the standard adopted by the Commission. Moreover, a highly particularized public notice standard might obstruct the legislative purpose of providing utility patrons with a basic knowledge of the possible consequences of proposed Commission action. A detailed public statement of all the material issues raised by a utility's general rate increase petition, and couched in the technical jargon of the public utility field, might convey significantly less information to the average ratepayer than

a succinct notice of the Commission's intention to consider a general increase in rates. Our holding is limited to a determination that Commission Rule 8(b) constitutes a reasonable administrative interpretation of the public notice required by the Act. The City has not challenged the reasonableness of the Commission's notice standard as applied to the facts of this particular case.

## V.
## USED AND USEFUL PLANT

A. Interconnection Plant

The Public Service Commission Act requires that all plant included in a utility's jurisdictional rate base constitute property which is "used and useful" in providing service to ratepayers. IC 1971, 8-1-2-6 (Burns Code Ed.). A portion of Petitioner's utility plant is utilized in maintaining "interconnection" arrangements with neighboring electric utility systems. An "interconnection" is a transmission line joining two electric power networks so that current flowing in either system can be diverted into the other. Petitioner's interconnection plant allows it to engage in both the wholesale purchase and sale of electric power. Some of the power purchased through the interconnection grid is used to serve Petitioner's retail or jurisdictional customers, and the remainder of the power purchased at wholesale is resold at wholesale rates to other interconnected electric utilities, such as municipally owned utility systems. The Petitioner also utilizes its interconnection arrangements to sell power generated within its system to neighboring electric utilities. Since the Federal Power Commission exercises the authority to establish rates for wholesale power transfers in interstate commerce, the Commission employs an accounting method to separate jurisdictional interconnection plant (facilities included within the interconnection system devoted to serving retail customers) from non-jurisdictional interconnection plant (plant devoted wholly to wholesale power transfers). The

"separation" technique adopted by the Commission utilized a complex cost-allocation process designed to identify the jurisdictional or non-jurisdictional nature of each interconnection plant component. The revenues and expenses attributed to jurisdictional interconnection plant were utilized by the Commission in determining the Petitioner's revenue requirement.

The City attacks the Commission's finding that a portion of the interconnection plant maintained by Petitioner is "used and useful" in the provision of electric service to jurisdictional or retail ratepayers on two grounds. First, the City argues that the inclusion of any portion of the interconnection plant in Petitioner's jurisdictional rate base constitutes a usurpation of the Federal Power Commission's jurisdiction over wholesale power transfers which affect interstate commerce. Second, the City contends that the Commission's basic findings of fact are inadequate to support its ultimate determination that a portion of the interconnection plant is "used and useful" in providing service to jurisdictional ratepayers. The City did not challenge the validity of the cost-allocation method utilized by the Commission to separate jurisdictional and non-jurisdictional interconnection plant.

The City's first argument misapprehends the complex interaction between the federal and state systems of electric utility regulation. The Federal Power Act grants the Federal Power Commission authority to regulate sales of electric energy at wholesale in interstate commerce. Federal Power Act, § 201(a), 16 U.S.C. § 824(a) (1970). This broad statutory standard is the sole basis for the City's conclusion that an allocable share of interconnection facilities cannot be included in Petitioner's jurisdictional rate base. The Federal Act, however, extends the federal regulatory power over interstate commerce to only certain limited aspects of interconnection operations. *See, e.g.,* Federal Power

Act § 201(b), 16 U.S.C. § 824(b) (1970) (exempts "facilities used for the generation of electric energy" and "facilities used in local distribution" from FPC jurisdiction.). The interlocking and concurrent nature of federal and state regulation can be illustrated by a functional analysis of Petitioner's interconnection operations. When the Petitioner purchases power from a neighboring utility, the wholesale price of the purchased power is determined by a rate fixed by the Federal Power Commission. After the purchased power is transferred to the Petitioner's local distribution system for consumption by retail utility patrons, federal regulatory involvement is terminated. The rate charged the Petitioner's retail or jurisdictional consumers is established by the Public Service Commission of Indiana. The retail rate fixed by the Commission is designed to provide a fair return on the portion of the interconnection plant devoted to providing retail consumers with the power purchased at wholesale. In light of this regulatory scheme, the Federal Power Commission's authority to supervise wholesale power transfers does not preempt the Public Service Commission from allocating an appropriate portion of Petitioner's interconnection plant to the jurisdictional rate base.

The City has also challenged the adequacy of the Commission's factual findings supporting its determination that a portion of the interconnection plant is "used and useful" in serving jurisdictional ratepayers. The Commission's findings concerning the "used and useful" status of the interconnection plant state that:

"In order to maximize the reliability of Petitioner's service to its customers, Petitioner maintains arrangements with other neighboring utilities to provide for emergencies and exchange of reserve power. . . . Through these interconnection arrangements the Petitioner is enabled to give completely reliable service more economically, to coordinate with other companies in the scheduling of repairs and to participate in the economies which a large single system affords. These interconnection arrangements do not impose any burden on Petitioner's customers but instead provide

substantial benefits from the standpoint of economies and reliability of service." *Record* at 2474.

 Although the Commission's findings concerning the "used and useful" status of the interconnection plant are somewhat ambiguous and conclusory, they are minimally adequate to support its determination. The Commission essentially found that Petitioner's interconnections benefit its jurisdictional customers by lowering the cost of generating electricity and by increasing the reliability of service. From our independent review of the record, we conclude that the Commission's basic findings concerning the "used and useful" status of the interconnection plant are supported by substantial evidence. Director of Electric Operations, John Warmack, testified that Petitioner's interconnection facilities improved the reliability of service to jurisdictional customers because electricity generated in a neighboring system can be utilized to compensate for breakdowns, overloads and plant out of service for normal maintenance. Mr. Warmack also explained that the interconnection plant permitted a reduction in the cost of generating electricity for Petitioner's jurisdictional customers.

Since interconnections allow neighboring utilities to share generating capacity, existing equipment can be operated at comparatively low unit cost and can be utilized on a continuous basis. Mr. Warmack testified that, under certain operating conditions, it would be cheaper to purchase power to meet incremental load requirements than to generate it within Petitioner's system. It was also explained that less total reserve capacity is required in an interconnected system, so jurisdictional consumers pay less for idle generating plant. This is because all electric utilities own and maintain some generating equipment that they rarely, if ever, use at full capacity. *See, e.g.,* 1 FEDERAL POWER COMM'N, NATIONAL POWER SURVEY 175-77 (1964). Some equipment is normally kept in operation with no electricity being fed

from it to the transmission lines. Utilities maintain this idle capacity to enable them to meet peak demand loads, and to provide back-up generating units to replace regularly used units that break down or are idled for maintenance. When two utility systems with independent generating capacities interconnect, they require less reserve capacity. If their peak loads—the timing and extent of which can be predicted with reasonable accuracy—come at different times, reserve units in one system can back up operating units in the other system. *See id.* at 182-97. The Commission's finding that the interconnection plant allocated to the jurisdictional rate base provides Petitioner's ratepayers with the benefits of ". . . economies which a large single system affords" has substantial support in the record. *Record* at 2475.

B. Allocation of Common Plant

In addition to its electric service operations, Petitioner engages in the business of selling natural gas. Since the Petitioner's electric and gas enterprises constitute separate entities for rate-making purposes, the Commission must allocate certain "common plant" between electric and gas operations in determining the portion of "common plant" which is "used and useful" in providing service to *electric* ratepayers. "Common plant" constitutes plant which is utilized in providing both gas and electric services, such as administrative office space, trucks, equipment, etc. In allocating "common plant" between gas and electric operations, the Commission adopted a separation technique denominated as the "supervised expense" method. This method allocates the electric and gas components of common plant by application of the ratio of total gas and total electric expenses to certain combined and separate elements of common plant. Thus, the Commission found that approximately seventy-seven percent of the common plant was properly allocated to the jurisdictional electric rate base because seventy-seven percent of

Petitioner's total expenses were incurred in its electric operations.

The City has attacked the Commission's allocation of common plant on the ground that its finding is not supported by substantial evidence. The City's sole contention is that the record does not contain an adequate explanation of the "supervised expense" method of allocation. It asserts that the allocation of common plant derived from the "supervised expense" technique cannot provide evidentiary support for the Commission's finding because the record contains no detailed explanation of the accounting principles underlying the allocation method utilized by the Commission. The City's contention is wholly based upon the following excerpt from the Supreme Court's opinion in *Public Serv. Comm'n* v. *Indiana Bell Tel. Co.* (1956), 235 Ind. 1, 25-26, 130 N.E.2d 467, 478:

> "The law is equally well settled that 'an order of the Commission must be founded upon facts found by the Commission based upon substantial evidence.' *Public Serv. Comm.* v. *Ft. Wayne U. Ry. Co.* (1953), 232 Ind. 82, 111 N.E.2d 719, 726; *Kosciusko County, etc.* v. *Public Service Comm.* (1948), 225 Ind. 666, 672, 77 N.E.2d 572, and cases there cited

> "Finding number 3 of the Commission pertaining to separation method, is as follows:

>> 'Since the original order was entered in this cause the National Association of Railroad and Utilities Commissioners' Committee, together with the Bell System, has agreed upon what is now known as the "Charleston Method of Separation," which appears to produce a result only slightly different from that produced by the method set forth and previously described as "Honaker Method No. 1." This Commission is now of the opinion that the new "Charleston Method" is the best that has yet been promulgated, and gives a more equitable result to the petitioner and to the public, and it has, therefore, been used by the Commission for the separation of the properties and expenses of the Indiana Bell Telephone Company as between its interstate and intrastate operations in this order.'

"There is no evidence in the record concerning the 'Charleston Method', nor are we able from a careful consideration of the entire finding, to determine what such method is; what is its formula of classification of interstate and intrastate property; to what properties and expenses it was applied, or how and by what system of allocation or division the fair value of appellee's intrastate property was determined to be $94,792,091. This finding is not only unsupported by evidence, but is clearly inadequate and improper in that neither the Marion Circuit Court nor this court can ascertain from such finding how the fair value of appellee's intrastate property was determined. *Public Serv. Comm.* v. *Ft. Wayne U. Ry. Co., supra* (1953), 232 Ind. 82, 96, 111 N.E.2d 719."

The Commission's finding on the amount of common plant "used and useful" in providing electric service was based on Petitioner's Exhibit A-III, which contained a summary of common plant allocated under the "supervised expense" technique. The sponsor of Exhibit A-III, Mr. Clifford, was cross-examined at length by the City concerning the nature of the "supervised expense" technique and the allocation obtained by its application to Petitioner's common plant account. The Commission's order contains no specific finding on the dollar amount of common plant allocated to the jurisdictional electric rate base, but from the context of the order it would appear that the Commission accepted the seventy-seven percent allocation advanced by Petitioner's Exhibit A-III. The City raised no objection to the admission of Petitioner's Exhibit A-III. It neither disputed the accuracy or validity of the "supervised expense" method nor questioned its application to particular items of the common plant account. The City's right to cross-examine Petitioner's expert witnesses concerning the accounting principles underlying the "supervised expense" method and the manner in which the method was applied to Petitioner's common plant account was not impaired by the Commission. Since the City failed to dispute the validity of the allocation method *at the hearing,* the City cannot challenge, for the first time on appeal, the

adequacy of the Commission's basic findings on its choice of common plant allocation methods. The Commission's duty to formulate basic findings of fact only requires ". . . a specific finding of the facts relevant to every sincerely asserted theory of claim or defense which is seriously presented . . ." at the formal hearing. *Bendix Corp.* v. *Radecki* (1973), 158 Ind. App. 370, 302 N.E.2d 847, 851-52.

Our independent review of the record reveals that the Commission's adoption of the "supervised expense" method of common plant allocation was based upon substantial evidence.[9] Mr. Clifford, Petitioner's Comptroller and the sponsor of Exhibit A-III, engaged in a lengthy explanation of the principles underlying the "supervised expense" method and the manner in which it was applied to Petitioner's common plant account. Mr. Clifford stated that the "supervised expense" method is

---

9. At the formal hearing, the Petitioner requested that the Commission take administrative notice of certain prior Commission orders which had adopted the "supervised expense" method in fixing rates for Petitioner's gas operations. The purpose of Petitioner's request was to demonstrate that the Commission had consistently accepted the "supervised expense" method in prior proceedings concerning both Petitioner's gas and electric operations. When the Commission indicated its willingness to take administrative notice of the prior rate orders, counsel for the City stated:

"To the extent that the Commission has the authority by law to take administrative notice of its own proceedings and files, I would have no objection." *Record* at 1977.

The City now argues that the Commission has no authority to take administrative notice of its prior orders. The City has waived its right to appellate review of the Commission's ruling. The City's objection was not sufficiently specific to present any intelligible challenge to the Commission's ruling. *See, e.g., County Dep't of Pub. Welfare* v. *Morningstar* (1958), 128 Ind.App. 688, 151 N.E.2d 150; *Dorozinski* v. *Review Bd. of Ind. Employment Sec. Div.* (1951), 121 Ind. App. 367, 98 N.E.2d 911

Moreover, none of the City's seventy-two assignments of error contain any specific allegation of error concerning the Commission's action in taking administrative notice of its prior orders. In any event, our determination that the Commission's adoption of the "supervised expense" method is supported by substantial evidence renders our consideration of the administrative notice issue unnecessary. It is well established that the admission of incompetent or immaterial evidence will not justify setting aside administrative agency action if there is substantial evidence to support the agency's decision. *State ex rel. Byers* v. *School City of Evansville* (1941), 219 Ind. 288, 37 N.E. 2d 934; *Warren* v. *Indiana Tel. Co.* (1940), 217 Ind. 93, 26 N.E. 2d 399.

a separation technique for the allocation of items of common plant between gas and electric operations utilizing criteria of separation which most accurately reflect the amount of common plant employed in the respective operations. It was explained that the primary criterion of separation was the amount of "total electric" and "total gas" expense attributable to certain classifications or individual items of common plant. Mr. Clifford testified that the allocation of "total electric" and "total gas" expense to the components of common plant was based on a review of company accounts which were designed to reflect the amount of both types of expense incurred by common plant items during the test year. Mr. Clifford also explained how the allocation method was applied to particular items of common plant such as garage space and office equipment.

The Supreme Court's holding in *Public Service Comm'n* v. *Indiana Bell Tel. Co., supra,* does not support the City's assertion that the Commission's adoption of the "supervised expense" method was not based upon substantial evidence. In the *Indiana Bell* case, the legality of a Commission rate order was challenged in the Marion County Circuit Court under the prior statutory procedure which prescribed *de novo* judicial review of Commission rate decisions. *See* Ind. Ann. Stat. §§ 54-429 to -438 (Burns 1951 Repl.), *repealed by* ch. 189, [1957] Ind. Acts 395, § 13. The Circuit Court heard evidence materially different from that presented to the Commission, determined that the rate established by the Commission was invalid, and transmitted the new evidence to the Commission for a redetermination on the rate issue. Without any further hearing, the Commission entered a revised order which established a new rate. In reviewing finding number three of the Commission's revised order, the *Indiana Bell* Court noted that the "Charleston method" of allocation had not been employed in the Commission's initial proceeding and had not been utilized by the Circuit Court. Since the Commission's revised order was issued without

further hearing, the Court determined that there was a total absence of evidence supporting the Commission's adoption of the "Charleston method." The Court concluded:

> "In a matter such as the action at bar the Commission cannot act on its own independent information, but must base its findings upon evidence presented in the case, with an opportnuity to cross-examine witnesses, to inspect documents or exhibits, and to offer evidence in explanation or rebuttal and nothing can be treated as evidence which has not been introduced as such. *Public Serv. Comm.* v. *Ft. Wayne U. Ry. Co., supra* (1953), 232 Ind. 82, 96, 111 N.E.2d 719; *Atchison, T. & S.F. Ry. Co.* v. *Commerce Commission* (1929), 335 Ill. 624, 167 N.E. 831, 837; *Ohio Bell Teleph. Co.* v. *Public Utilities Comm.* (1937), 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093, 1099." 235 Ind. at 27, 130 N.E.2d at 479

In this proceeding, Petitioner's Exhibit A-III was properly offered and admitted into evidence without objection. The City had ample opportunity to inspect the prefiled testimony prior to the hearing, to cross-examine Petitioner's expert witnesses, and to rebut evidence concerning the "supervised expense" method and its application to the common plant account

C. Deferred Tax Expense Reserve Account

Under the Commission's "rate base—rate of return" system, the ratepayers of a regulated utility pay a rate sufficient to return to the utility the cost of service plus a specified rate of return on the utility's capital investment. Taxes are a component of the utility's cost of service to be reimbursed by the ratepayers. The petitioner has adopted the practice of depreciating its plant at an accelerated rate for purposes of federal income tax as authorized by section 167 of the Internal Revenue Code. 26 U.S.C. § 167 (1970). Section 167 permits the cost of utility plant to be depreciated by methods which generate more depreciation expense in the early years of the property's useful life, and less in later years, than would be generated by traditional straight-line depreciation methods. The Petitioner also utilizes the investment tax

credit provided by section 38 of the Code in computing its federal tax liability. 26 U.S.C. § 38 (1970). Section 38 permits a certain percentage of new and used depreciable utility plant to be credited directly against the Petitioner's federal tax liability for the tax year in which the plant is acquired. Both of these tax options operate to reduce the Petitioner's federal tax expense during the first years of its plant's useful life, and to increase tax expense in later years.

For purposes of regulatory accounting, the Commission has allowed the Petitioner to claim as a current expense not only the federal taxes actually paid, but also an amount equal to the difference between the taxes actually paid and the taxes which would have been due if the Petitioner had adopted straight-line depreciation. The Commission also has permitted the Petitioner to amortize the tax saving obtained by the investment tax credit over the useful life of its depreciable plant. When the Petitioner's tax expense is "normalized" in this manner, the ratepayers are charged not the actual income taxes paid but a hypothetical larger figure for Petitioner's tax expense computed as if depreciation were determined on a straight-line basis, and as if the investment credit were distributed in equal amounts over the plant's useful life. The difference between the actual taxes paid by the Petitioner and the larger hypothetical amount for taxes charged to the ratepayers is accumulated in a "deferred tax" reserve account. The funds in this reserve account are utilized by the Petitioner as working capital free of any charges for interest and dividends. The Commission has traditionally permitted the Petitioner to include the balance of its "deferred tax" reserve account in the jurisdictional rate base and to obtain its normal "fair rate of return" on these funds.

The City contends that the Petitioner should not be entitled to any return upon its accumulated "deferred tax" funds. The City asserts that the capital represented by Petitioner's reserve for deferred federal income taxes is available to the company without charge because the funds for normalizing

the tax expense and accumulating the reserve constitute enforced contributions from consumers. Since these "consumer contributed" funds are utilized by the Petitioner free of any charges for dividend or interest, the City argues that they should be excluded from the Petitioner's jurisdictional electric rate base. The Commission's final order does not discuss the City's challenge to the inclusion of Petitioner's accumulated "deferred tax" reserve in the rate base.

Under traditional regulatory concepts, utility company shareholders and bondholders, not the consumers, furnish the capital necessary for the operation of the business. *See, e.g., Railroad Comm'n* v. *Cumberland Tel. & Tel. Co.* (1909), 212 U.S. 414, 424, 29 S.Ct. 357, 53 L.Ed. 577; *Lindheimer* v. *Illinois Bell Tel. Co.* (1934), 292 U.S. 151, 169, 54 S.Ct. 658, 78 L.Ed. 1182. The consumer pays a fair return on the utility's capital and in addition pays the costs of operation including taxes, but it is well-established that the company's investors, not its consumers, must contribute the utility's capital. *See, e.g., City of Alton* v. *Commerce Comm'n* (1960), 19 Ill.2d 76, 165 N.E.2d 513; *In re Pacific Gas & Elec. Co.* (1961 Cal. Pub. Util. Comm'n), 38 P.U.R.3d 1; *In re Public Serv. Co.* (1960 Colo. Pub. Util. Comm'n), 34 P.U.R.3d 186; *In re Washington Water Power Co.* (1960 Idaho Pub. Util. Comm'n), 33 P.U.R.3d 88; *In re Columbia Gas, Inc.* (1959 Ky. Pub. Serv. Comm'n), 36 P.U.R.3d 401; *In re Niagara Mohawk Power Corp.* (1961 N.Y. Pub. Serv. Comm'n), 40 P.U.R.3d 401; *In re Cincinnati Gas & Elec. Co.* (1960 Ohio Pub. Util. Comm'n), 33 P.U.R.3d 1.

Our Public Service Commission Act reflects the traditional notion that the "fair rate of return" which a regulated utility is permitted to earn must be based upon capital advanced by its investors. IC 1971, 8-1-2-6 (Burns Code Ed.) provides that the Commission ". . . shall value *all property of every public utility* actually used and useful for the convenience of the public at its fair value . . ." in establishing "reasonable and just" rates. Consistent with the statutory principle, the

Indiana Supreme Court has held that customer contributions in aid of construction cannot be included in the fair value of the property upon which the utility's return is determined. *Public Serv. Comm'n* v. *City of Indianapolis* (1956), 235 Ind. 70, 93, 131 N.E.2d 308, 317.

The funds represented by the Petitioner's accumulated "deferred tax" reserve account clearly constitute consumer contributed capital. While it is true that these funds are extracted from the ratepayers and held in reserve to meet future tax liabilities,[10] the Petitioner enjoys the unrestricted use of the reserve fund free of any interest charge until the deferred tax expenses are actually paid. The revolving nature of the "deferred tax" reserve fund ensures a steady in-flow of consumer contributed capital; Petitioner's combined "deferred tax" reserves total more than six and one-half million dollars. Under the Commission's

---

10. Supporters of normalization argue that lower taxes in the early years of an asset must be compensated for by higher taxes in later years. *See, e.g., El Paso Natural Gas Co.* v. *Federal Power Comm'n* (5th Cir. 1960), 281 F.2d 567, *cert. denied sub nom. California* v. *Federal Power Comm'n* (1961), 366 U.S. 912, 81 S.Ct. 1083, 6 L.Ed.2d 236. Both the Public Service Commission and the Supreme Court of Indiana have accepted this argument. *Boone County Rural Elec. Membership Corp.* v. *Public Serv. Comm'n* (1959), 239 Ind. 525, 159 N.E.2d 121. Proponents of the "flow-through" method of regulatory accounting point out that so long as investment in plant does not decrease, the higher depreciation on new assets in future years will offset lower depreciation on older assets so that the deferred taxes will never be paid. *See, e.g., Alabama-Tennessee Natural Gas Co.* v. *Federal Power Comm'n* (5th Cir.), 359 F.2d 318, *cert. denied,* 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). Under the "flow-through" treatment of accelerated tax depreciation, the ratepayers reimburse the utility for the federal income taxes the regulated utility actually pays. The utility does not accumulate capital funds that are, in effect, enforced contributions from consumers to satisfy higher anticipated tax liabilities. Proponents of normalization argue that by permitting accelerated depreciation, Congress intended to encourage investment, not to benefit ratepayers, and that "flow-through" defeats this intent by lowering the rates a utility can receive. *See, e.g.,* Flittie & Armour, *The Natural Gas Experience—A Study in Regulatory Aggression and Congressional Failure to Control the Legislative Process,* 19 SW. L.J. 448, 495-99 (1965). Opponents of normalization reply that regulated industries need not be encouraged to invest since by definition their growth is regulated, and conclude that the only effect of normalization is to collect higher rates from present ratepayers to provide for a tax burden which future ratepayers will never have to bear. *See, e.g.,* Swiren, *Accelerated Tax Benefits in Utility Rate Making,* 28 U. CHI. L. REV. 629 (1961).

method, the Petitioner employs these funds in the same manner as investor contributed capital, and reaps a double benefit—the funds are obtained at zero capital cost, but the Petitioner earns a "fair rate of return" upon these same funds by employing them in its business. Professor Bonbright, a noted authority on regulatory economics, has expressed a similar criticism:

> "[I]t [the method adopted by the Commission] has the charm of imposing upon the consumers the obligation to pay deferred-tax allowances which, instead of being transmitted forthwith to the United States Treasury, are to be treated as capital investments, entitled indefinitely to the enjoyment of a 'fair rate of return' for the benefit of the corporate stockholders. . . . Support for this position of the industry has been forthcoming from the Federal Power Commission and from a few state commissions. But I have never seen a plausible defense of this claim to the enjoyment of a profit on funds not contributed by the corporate investors." J. BONBRIGHT, PRINCIPLES OF PUBLIC UTILITY RATES 220-21 (1961) (footnotes omitted).[11]

An overwhelming majority of the state regulatory agencies have accepted Professor Bonbright's position; these agencies and the Federal Power Commission have consistently denied any return on the accumulated "deferred tax" reserves of regulated utilities.[12]

---

11. Professor Bonbright's statement has become inaccurate in regard to the Federal Power Commission's current position on permitting regulated utilities to obtain a return on "deferred tax" reserve funds. The FPC's decision in *In re Amere Gas Util. Co.* (1956), 15 F.P.C. 760, did allow the utilities to obtain a return on these funds. However, in *In re Alabama-Tennessee Natural Gas Co.* (1964), 31 F.P.C. 928, 933, the FPC reversed its prior position and held that:

". . . Alabama-Tennessee and other natural gas companies similarly situated are not entitled to any return upon such consumer-contributed capital."

12. *See In re Alabama-Tennessee Natural Gas Co.* (1964 F.P.C.), 31 F.P.C. 928, 52 P.U.R.3d 118; *In re Alaska Elec. Light & Power Co.* (1967 Alas. Pub. Serv. Comm'n), 70 P.U.R.3d 481; *In re Arkansas Louisiana Gas Co.* (1972 Ark. Pub. Serv. Comm'n), 96 P.U.R.3d 209; *In re Tax Treatment of Accelerated Depreciation* (1961 Cal. Pub. Util. Comm'n), 40 P.U.R.3d 322; *In re Public Serv. Co.* (1960 Colo. Pub. Util. Comm'n), 34 P.U.R.3d 186; *In re Chesapeake & P. Tel. Co.* (1964 D.C. Pub. Serv. Comm'n), 57 P.U.R.3d 1; *In re Florida Power & Light Co.* (1966 Fla. Pub. Serv. Comm'n), 67 P.U.R.3d 113; *In re Accounting*

We hold that the method adopted by the Commission for the treatment of Petitioner's "deferred tax" reserves results in a schedule of rates which are not "reasonable and just" to the extent that the method permits the Petitioner to obtain a return on funds contributed by consumers. IC 1971, 8-1-2-4 (Burns Code Ed.). However, we reject the City's contention that the Public Service Commission Act requires the exclusion of consumer contributed capital from the rate base in all cases. Our holding focuses solely on the unreasonableness of consumer rates which permit the Petitioner to obtain a return on capital not advanced by its investors. Whether or not all or a portion of the accumulated "deferred tax" reserves should be included in Petitioner's rate base is a decision best consigned to the Commission's informed discretion. In light of Petitioner's significant capital requirements, the Commission may find it preferable to in-

*Procedure for Investment Tax Credit* (1963 Ga. Pub. Serv. Comm'n), 47 P.U.R.3d 171; *In re Honolulu Gas Co.* (1960 Hawaii Pub. Util. Comm'n), 36 P.U.R.3d 309; *In re Washington Water Power Co.* (1960 Idaho Pub. Util. Comm'n), 33 P.U.R.3d 88; *In re Alton Water Co.* (1960 Ill. Commerce Comm'n), 35 P.U.R.3d 284; *In re Iowa Pub. Serv. Co.* (1972 Iowa Commerce Comm'n), 96 P.U.R.3d 1; *In re South Central Bell Tel. Co.* (1972 Ky. Pub. Serv. Comm'n), 96 P.U.R.3d 493; *Ex parte South Central Bell Tel. Co.* (1973 La. Pub. Serv. Comm'n), 98 P.U.R.3d 185; *In re Chesapeake & P. Tel. Co.* (1964 Md. Pub. Serv. Comm'n), 56 P.U.R.3d 91; *In re New England Tel. & Tel. Co.* (1973 Mass. Dep't of Pub. Util.), 100 P.U.R.3d 189; *In re Accounting & Rate Case Treatment of Liberalized Depreciation* (1963 Mich. Pub. Serv. Comm'n), 49 P.U.R.3d 1; *In re Southwestern Bell Tel. Co.* (1972 Mo. Pub. Serv. Comm'n), 96 P.U.R.3d 148; *In re Sierra Pacific Power Co.* (1965 Nev. Pub. Serv. Comm'n), 58 P.U.R.3d 477; *In re Public Serv. Co.* (1959 N.H. Pub. Serv. Comm'n), 27 P.U.R.3d 113; *In re Blackwood Water Co.* (1966 N.J. Bd. of Pub. Util. Commr's), 63 P.U.R.3d 477; *In re Southwestern Pub. Serv. Co.* (1973 N.M. Corp. Comm_n), Docket No. 1070, April 12, 1973; *In re Niagara Mohawk Power Corp.* (1961 N.Y. Pub. Serv. Comm'n), 40 P.U.R.3d 401; *In re Otter Tail Power Co.* (1963 N.D. Pub. Serv. Comm'n), 49 P.U.R.3d 305; *In re Cincinnati Gas & Elec. Co.* (1960 Ohio Pub. Util. Comm'n), 33 P.U.R.3d 1; *In re Portland Gen. Elec. Co.* (1960 Ore. Pub. Util. Comm'r), 32 P.U.R.3d 497; *Pennsylvania Pub. Util. Comm'n* v. *Pennsylvania Power Co.* (1960 Pa. Pub. Util. Comm'n), 33 P.U.R.3d 177; *In re New England Tel. & Tel. Co.* (1973 R.I. Pub. Util. Comm'n), 99 P.U.R.3d 228; *In re Northwestern Bell Tel. Co.* (1972 S.D. Pub. Util. Comm'n), 97 P.U.R.3d 476; *In re Inter-Mountain Tel. Co.* (1965 Tenn. Pub. Serv. Comm'n), 59 P.U.R.3d 337; *Washington Pub. Serv. Comm'n* v. *Pacific Power & Light Co.* (1960 Wash. Pub. Serv. Comm'n), 33 P.U.R.3d 433; *In re Kansas-Nebraska Natural Gas Co,* (1973 Wyo, Pub. Serv. Comm'n), 100 P.U.R.3d 129,

clude the reserves in the rate base, and reduce to zero the rate of return allowed on plant constructed with the reserve funds. The Commission might choose to allow the Petitioner the use of the reserve funds as working capital, while assigning the funds a zero cost of capital in computing the Petitioner's "fair rate of return." The Commission will have ample opportunity to consider the efficacy of these methods on remand.

D. Termination of Wholesale Transfers to REMC and ALCOA

During the test year, the Petitioner made substantial non-jurisdictional or wholesale sales of electric power to several rural electric membership corporations (REMCs). Prior to the end of the test year, the Petitioner was notified that the REMCs would discontinue their purchases of wholesale power because of the completion of a new "Statewide REMC" generating facility. Also prior to the end of the test year, the Petitioner executed an agreement to sell certain of its transmission plant to the "Statewide REMC" group. These transmission facilities had been employed in providing the REMCs with wholesale power and were no longer useful in Petitioner's operations. Since the transmission plant had been utilized in Petitioner's wholesale electric operations, its disposal had no effect on the jurisdictional rate base. The Commission's final order concluded that the portion of Petitioner's generating plant which had been devoted to supplying the REMCs with wholesale power should be transferred to the jurisdictional rate base. The Commission's conclusion was based upon its determination that, although the generating plant had been devoted to non-jurisdictional operations during the test year, these generating facilities would be available to satisfy the needs of jurisdictional or retail ratepayers in the very near future.

The City contends that the generating plant used during the test year to provide the REMCs with wholesale power should not have been transferred to the Petitioner's jurisdic-

tional rate base.[13] The City correctly points out that the REMC-related generating plant was not employed in Petitioner's jurisdictional operations during the test year, and the Commission's decision to shift these facilities to the jurisdictional rate base required an "out-of-period" adjustment. The City asserts that the Commission's "out-of-period" adjustment to the test year jurisdictional rate base was not based on a future event that was "known, fixed and measurable," as required by the prehearing order. *See* Section III, p. 486, *supra.*

We have discussed the propriety of the Commission's use of estimates and forecasts in the rate-making process. *See* Section III, p. 486, *supra.* To the extent that the City's challenge to the validity of this particular "out-of-period" adjustment also constitutes an attack on the "reasonableness" of the Commission's use of an historical test year, adjusted for future events, we feel that ample attention has already been given to that broader weakness in the Commission's order. *See* Section III, p. 486, *supra.* Therefore( the narrow issue presented by the City's contention is whether the Commis-

---

13. During the test year, wholesale power sales were made to the Aluminum Company of America (ALCOA) under a "one-time" block sale contract. Petitioner's witness, Mr. Larson, testified that the contract sales to ALCOA ended on December 31, 1970, which was during the test year. In determining the amount of property allocable to the jurisdictional rate base, the Commission transferred the portion of Petitioner's generating plant which had been devoted to supplying ALCOA with wholesale power to Petitioner's jurisdictional operations. The City has challenged the Commission's decision; it contends that there is no evidence that the ALCOA-related generating plant will be available to provide electric service to Petitioner's jurisdictional customers. The City's argument seems to suggest that the Petitioner's generating plant was constructed for the sole purpose for providing wholesale power under the "one-time" ALCOA contract. Petitioner's witness, Mr. Larson, testified that very little of the electric power sold to ALCOA was generated within Petitioner's system; Mr. Larson explained that most of the power sold to ALCOA was purchased from other electric utilities under Petitioner's interconnection agreements. To the extent that any of the Petitioner's generating plant was actually used to provide power for the ALCOA sale, the Commission's decision to include the undetermined amount of such plant in the jurisdictional rate base was supported by substantial evidence. It is obvious that, since the ALCOA contract terminated in December, 1970, the generating plant "used" to provide power for the ALCOA sales was available at the end of the test year to provide power for jurisdictional customers.

sion's conclusion that the REMC-related generating plant would be devoted to jurisdictional operations in the reasonably foreseeable future is supported by substantial evidence.

There is substantial evidence to support the Commission's conclusion that the REMC-related generating plant would be available, in the foreseeable future, to provide power for jurisdictional customers. Petitioner's expert witness, Mr. Larson, testified that the Petitioner's wholesale sales to the REMCs would end in the near future due to the completion of a new "Statewide REMC" generating facility. Mr. Larson also explained that Petitioner had executed an agreement for the sale of certain plant used to transmit the wholesale power to the REMC's. The sale contract had been executed by the Petitioner and the "Statewide REMC" prior to the end of the test year. The City contends that the Commission's decision was not supported by substantial evidence because there was no proof of the exact date when the "Statewide REMC" generating plant would commence operations, and the contract for the sale of the transmission facilities had not been actually performed at the end of the test year. We reject the City's contention that the Commission's prediction concerning the impending termination of the REMC wholesale sales was too speculative. There is no evidence in the record which suggests the continuation of the REMC sales. The Commission's inability, at the time of the hearing, to pinpoint the precise date upon which the sales would end does not deprive its decision of substantial evidentiary support.

E. The "Used and Useful" Standard

The Public Service Commission Act provides that "the commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value. . . ." IC 1971, 8-1-2-6 (Burns Code Ed.). A review of prior rate orders indicates that the Commission has developed a bifurcated test for deter-

mining the "used and useful" status of a utility's property. The Commission's "used and useful" standard requires: (1) that the utility plant be actually devoted to providing utility service, and (2) that the plant's utilization be reasonably necessary to the provision of utility service. *See, e.g., In re Indianapolis Water Co.* (1964 Ind. Pub. Serv. Comm'n), Docket No. 30,022, June 17, 1964 (property held for future use was not "reasonably necessary"); *In re Indianapolis Water Co.* (1958 Ind. Pub. Serv. Comm'n), 26 P.U.R.3d 270 (plant used only during peak demand period was "reasonably necessary"); *In re Indiana Gas & Water Co.* (1952 Ind. Pub. Serv. Comm'n), Docket No. 23,584, Sept. 25, 1952 (property under construction was not "actually in service").

## 1. The "In Service" Requirement

The Petitioner's Ohio River generating facility had been in continuous actual use for at least twenty-five years prior to the test year. The plant's total net capability of 121,000 kilowatts constitutes a substantial part of Petitioner's total generating capacity. On September 18, 1970, the City of Evansville notified the Petitioner that the Ohio River facility was in violation of the City's air pollution control ordinance. Petitioner determined that a complete modification of the existing boilers was necessary to permit the use of oil and natural gas rather than coal. The modification work was begun in January, 1971, and was substantially completed at the time of the formal hearing. As a result of the modification work, the Ohio River facility was not in actual use during the last six months of the test year. The Commission determined that the Ohio River plant was "used and useful" during the test year, and that its "fair value" was properly included in Petitioner's jurisdictional rate base. The amount spent for modification of the facility during the test year was denominated "work in progress," and was excluded from the jurisdictional rate base because the Commission found that the

conversion project had not been actually completed at the end of the test year.

The City contends that under the Commission's traditional "in service" test the Ohio River facility was not "used and useful" and should not have been included in the jurisdictional rate base. The City's conclusion that the Ohio River plant was not "in service" is solely based on the fact that the facility was not in actual use during the last six months of the test year. Since the Ohio River plant *was in actual use during the first six months of the test year*, the City's challenge devolves into the sweeping assertion that the Commission's "in service" test should, as a matter of law, require the actual utilization of an item of utility plant during the entire test year.

The City's challenge to the Commission's construction of its "in service" test constitutes an attack on the reasonableness of a regulatory policy decision. We hold that the Commission's "in service" test is reasonably related to its primary objective of obtaining the most accurate determination of the utility plant which is actually devoted to Petitioner's electric service operations. Under the City's interpretation of the "in service" requirement, any item of plant which was not actually employed during the entire test year would be automatically excluded from the rate base. Such an inflexible approach would presumably require exclusion from the rate base of plant which was out of service for routine maintenance or repair at any time during the test year. The "in service" test proposed by the City would also necessitate the exclusion of new facilities which are actually devoted to utility operations a few weeks or months after the commencement of the test year. While the apparent unreasonableness of the City's "in service" test does not necessarily establish the reasonableness of the Commission's standard, it does demonstrate the need for a flexible and pragmatic approach. The Commission's "in service" test seeks to focus on whether existing utility plant will continue to be actually employed in

future operations. While the Commission's approach eschews any fixed scheme of classification, we do not feel that this lack of certainty renders the Commission's method unreasonable. The "in service" issue will almost always be ultimately resolved by the exercise of informed regulatory judgment. The facts in this proceeding clearly demonstrate the rationality of the Commission's approach. The Ohio River facility constitutes a significant portion of the Petitioner's generating capacity. The facility was temporarily shut down for the sole purpose of modifying the plant so that it could be operated in compliance with municipal clean air standards. There was no evidence that the modification project would necessitate the indefinite closure of the facility, or that the plant could never be operated in compliance with the Evansville ordinace.

2. The "Reasonably Necessary" Requirement

The Commission's "used and useful" standard requires, in addition to the "in service" determination, that the utility plant included in the rate base be "reasonably necessary" to the efficient and reliable provision of utility service. The Commission's final order concluded that all of the Petitioner's "in service" jurisdictional plant and equipment was "reasonably necessary" to the continued maintenance of electric service operations. The Commission's findings of basic fact concerning the "reasonably necessary" status of the Petitioner's plant and equipment state that:

> "The demands on Petitioner's electric utility system have increased substantially during the past ten years and will continue to increase. In order to meet the increased demands for Petitioner's electric utility service it has been and will be necessary in the immediate future for the Petitioner to enlarge and extend its generation, transmission and distribution facilities requiring the expenditure and investment of substantial sums of money in plant properties and equipment. In addition, the Petitioner will be required to make substantial outlays in capital expenditures in order to comply with the environmental require-

ments of regulatory bodies having jurisdiction over pollution control in its various forms. These outlays of capital involve and will involve modifications of generating facilities as well as new or additional equipment. The prices for major items of plant property and equipment have risen substantially and continue to escalate." *Record* at 2475-76.

The City contends that the Commission's findings of basic fact are wholly inadequate to support the conclusion that any fixed amount of Petitioner's plant and equipment is "reasonably necessary." We agree with the City's contention; the sweeping generality of the Commission's "findings" effectively preclude any principled review of its "used and useful" determination. We have previously discussed the statutory requirement that the Commission formulate specific findings on all the factual determinations material to its ultimate conclusion. *See* Section II, pp. 482-486, *supra*. The patent deficiencies in the Commission's findings demonstrate the necessity for some intelligible analysis of *how and why* the agency arrived at its decision. The Commission's order does not disclose how current and projected demands for electric service in the Petitioner's service area were determined. The Commission's observations that "demands on Petitioner's electric utility system have increased substantially" and that these demands "will continue to increase" do not indicate that the Commission ever attempted to quantify the Petitioner's historical demand growth, or to establish any fixed estimates concerning the rate of future demand growth. Moreover, the Commission's conclusion that these "increased demands" require "the investment of substantial sums of money in plant properties and equipment" provides little enlightenment as to *how much* plant and equipment is "reasonably necessary" to satisfy existing and projected growth. The Commission's order would appear to suggest that "substantial" increases in demand for electric service justify any level of investment in plant and equipment which the Petitioner chooses to undertake. This sort of imprecision in the Commission's final order constitutes an implicit abdication of its legislatively imposed

rate-making function.[14] *See, e.g.*, IC 1971; 8-1-2-48; 8-1-2-23, 8-1-2-6 (Burns Code Ed.).

On remand, the Commission will be required to formulate specific findings of basic fact which adequately explain the material considerations underlying its determination that all of the Petitioner's "in service" plant and equipment is "reasonably necessary."

## VI.

## AUTOMATIC FUEL COST ADJUSTMENT PROVISION

Petitioner's proposed rates were partially based on the inclusion of an automatic fuel cost adjustment provision in the rate schedules for industrial and commercial customers. The automatic adjustment mechanism essentially constitutes prospective Commission authorization for an automatic upward or downward adjustment in rates:

> "Whenever the weighted average cost of fuel is greater or less than 27.0¢ per million BTU by any amount, there shall be a corresponding increase or decrease per kilowatt-hour billed at the rate of 0.0121¢ . . . for each 1.00¢ per million BTU departure from said standard cost, adjusted to the nearest 0.0005¢." *Record* at 2487.

---

14. Our review of the record indicates that the Commission's "findings" are actually mere excerpts from the Petitioner's pre-filed expert testimony. The following two portions of the testimony of Mr. Warmack, Petitioner's Director of Electric Operations, were clearly accorded great weight in the Commission's deliberations:

"Q. What is the situation with respect to the demands on Petitioner's electric utility system?

"A. The demands on Petitioner's electric utility system have increased substantially during the past ten years and it is estimated that the demand will continue to increase. In order to meet the increased demands for Petitioner's electric utility service it has been necessary for the Petitioner to enlarge and extend its generation, transmission and distribution facilities requiring the expenditure and investment of substantial sums of money in plant properties and equipment.

\* \* \*

"Q. Will the Petitioner be required to make substantial outlays in capital expenditures in order to comply with the requirements of regulatory bodies having jurisdiction over pollution control in its various forms?

"A. Yes." *Record* at 738, 742.

Under this automatic adjustment provision, the Petitioner was authorized to re-evaluate its base fuel cost at the close of each month of operations to determine the propriety of a rate revision. The net effect of the automatic adjustment provision on Petitioner's overall rate structure is to increase or decrease the kilowatt hour rate in the amount of any 0.0121 cent per million BTU variation from the base fuel cost of 27.0 cents per million BTU. The adjustment mechanism would be automatically triggered by any upward or downward fluctuation in Petitioner's fossil fuel expense determined on a month-by-month basis. The automatic adjustment provision was not included in the rate schedules for Petitioner's residential and street lighting customers.

The City contends that the automatic fuel cost adjustment formula approved by the Commission contravenes the Public Service Commission Act on two separate grounds. First, the City argues that the Commission's adjustment formula, which authorizes automatic rate revision without prior Commission approval, constitutes an unlawful sub-delegation of legislative rate-making authority to a non-governmental entity—the regulated utility. Second, the City contends that any rate revision premised upon a single element of expense results in a rate schedule which is *per se* unreasonable and unjust under the statutory. standard. The City asserts that "reasonable and just" rates can only be determined after the Commission has scrutinized, in a formal hearing, all of the operational factors affecting the utility's total financial condition. The City's second contention is based on the assumption that the statutory provision which mandates the Commission to establish "reasonable and just" rates contains an implied requirement that the Commission consider the utility's total operating experience in formulating rate schedules.

The Act does not expressly authorize the use of an automatic adjustment mechanism. The statutory provision which prescribes the procedure for modification of existing rate schedules provides :

"No change shall thereafter be made in any schedule, including schedules of joint rates, except upon thirty [30] days' notice to the commission and approval by the commission and all such changes shall be plainly indicated upon existing schedules or by filing new schedules in lieu thereof thirty [30] days prior to the time the same are to take effect. . . ." IC 1971, 8-1-2-42(a) (Burns Supp. 1975).

The Petitioner asserts that the Commission's automatic adjustment formula does not contravene the Act's requirement of express regulatory approval prior to any revision in existing rates. It is argued that the Act does not require the Commission to formulate rate schedules on a fixed price per unit basis, and that the automatic fuel cost adjustment formula merely provides a concrete method for the determination of "existing rates" based on a measurable fluctuation in the cost of fossil fuel.

The Petitioner's argument does provide an adequate refutation of the City's contention that the fuel cost adjustment provision constitutes an unconstitutional sub-delegation of regulatory authority. The use of an automatic adjustment mechanism does not authorize the Petitioner to unilaterally revise its rates based upon subjective determinations of increased fuel cost. The Commission's formula requires the Petitioner to demonstrate a fixed minimum fluctuation in fuel cost for a fixed minimum period prior to any rate revision. The employment of the kind of adjustment formula adopted by the Commission does not constitute a complete abdication of its regulatory function and does not offend the sub-delegation doctrine. *Accord, City of Chicago* v. *Illinois Commerce Comm'n* (1958), 13 Ill.2d 607, 150 N.E.2d 776; *City of Cleveland* v. *Public Util. Comm'n* (1965), 3 Ohio St.2d 82, 209 N.E.2d 424, *cer. denied,* 382 U.S. 982, 86 S.Ct. 558, 15 L.Ed.2d 472 (1966); *City of Norfolk* v. *Virginia Elec. & Power Co.* (1955), 197 Va. 505, 90 S.E.2d 140.

We also reject the City's contention that utility rates established pursuant to the Commission's automatic adjust-

ment formula are *per se* unreasonable and unjust. The City argues that the statutory provision, which expressly mandates the Commission to establish "reasonable and just" rates, impliedly mandates the Commission to consider all relevant factors affecting utility operations. IC 1971, 8-1-2-4 (Burns Code Ed.). The kernel of the City's argument is that automatic fuel cost adjustment provisions permit rates to be increased, above what has previously been determined to be a "reasonable and just" level, without consideration of all factors which should be examined in determining the reasonableness of a rate. In spite of the City's attempt to frame its challenge to the adjustment formula in terms of a conflict with the statutory scheme, we are unable to ascribe any special content to the Act's requirement that the Commission establish "reasonable and just" rates. The City's contention merely constitutes a challenge to the Commission's choice of a regulatory method. Since there is no provision of the Act which prohibits the adoption of an automatic rate adjustment mechanism, our standard of review only requires that the Commission's decision be reasonably related to the establishment of "reasonable and just" rates.

The Commission's decision to adopt a fuel cost adjustment formula for Petitioner's industrial and commercial rate schedules was based upon a determination that fuel expense constitutes approximately forty percent of the cost of providing electric service to industrial and commercial customers. The Commission has consistently refused to extend fuel cost adjustment to residential rate schedules for the reason that fuel expense constitutes a substantially smaller percentage of the total cost of service for residential customers. While it may be argued that downward trends in other elements of operating expense may at least partially offset increased fuel costs, the Commission has, in principle, rejected this contention. The Commission's position is that fuel-related expenses constitute such a substantial proportion of the total cost of service that these expenses will not be materially

offset by prospective downward trends in other expenses. While informed regulators may differ as to the validity of the Commission's policy justifications, the Commission's adoption of the automatic adjustment mechanism does not constitute an unreasonable policy decision.

Although we hold that the Commission's adjustment method is not proscribed by the Act, the manner in which the Commission administers its adjustment provision may nevertheless violate the letter and spirit of the statutory scheme. The Act provides that "[n]o change shall thereafter be made in any schedule, . . . except upon thirty [30] days' notice to the commission and approval by the commission. . . ." IC 1971, 8-1-2-42 (Burns Supp. 1975). The Petitioner argues that the Commission's adjustment mechanism complies with the Act's prior approval requirement because rate schedule revisions are approved in advance pursuant to a fixed fuel cost formula. The Petitioner's contention overlooks the fact that the Commission's adjustment provision does result in an actual alteration of the rate schedule based on the utility's redetermination of its current fuel cost. The key component of the rate adjustment formula—the base fuel cost—is revised without any apparent procedure for Commission approval prior to the effective date of the revised rate.

The Act's prior approval requirement reflects a broader legislative purpose to ensure that the Commission effectively performs its investigatory and supervisory functions. The Act mandates the Commission to "inquire into the management of the business of all public utilities" and to "keep itself informed as to the manner and method in which the same is conducted. . . ." IC 1971, 8-1-2-48 (Burns Code Ed.). Moreover, section 8-1-2-48 provides that:

"If, in its inquiry into the management of any public utility, the commission finds that the amount paid for the services of its officers, employees, or any of them, is excessive, . . . or that any other item of expense is being in-

curred by the utility which is either unnecessary or excessive, the commission shall designate such item or items, and such item or items so designated . . . shall not be taken into consideration in determining and fixing the rates which such utility is permitted to charge for the service which it renders."

The Act provides the Commission with the authority to examine the books and records of regulated utilities "upon demand." *Id.* 8-1-2-49. The Act invests the Commission with sweeping subpoena power. *Id.* 8-1-2-50 to -52. The Act also provides that:

"Whenever the commission shall believe that any rate or charge may be unreasonable or unjustly discriminatory or that any service is inadequate, or cannot be obtained, or that an investigation of any matters relating to any public utility should for any reason be made, it may, on its motion, summarily investigate the same, with or without notice." *Id.* 8-1-2-58.

We believe that these provisions of the Act proscribe an automatic rate adjustment mechanism which functions to revise rates without any procedure for prior Commission scrutiny and approval. The Public Service Commission Act clearly mandates continuing regulatory supervision and express approval of rate changes; the recent amendments to IC 8-1-2-42 strengthen our conviction that the Act requires the Commission to scrutinize and approve any proposed change in rates.[15]

---

15. IC 1971, 8-1-2-42 (Burns Supp. 1975), expressly provides for Commission approval, through a summary hearing procedure, prior to the effective date of any rate revision under the automatic fuel cost adjustment mechanism adopted by the Commission. The recent amendments to this section contain no provision which retroactively validates prior fuel cost adjustment rate revisions. The section provides in full:

"(a) No change shall thereafter be made in any schedule, including schedules of joint rates, except upon thirty [30] days' notice to the commission and approval by the commission and all such changes shall be plainly indicated upon existing schedules or by filing new schedules in lieu thereof thirty [30] days prior to the time the same are to take effect. The commission, upon application of any public utility, may prescribe a less time within which a reduction may be made.

However, we are unable to determine from the record of this proceeding whether or not the Commission has historically followed the practice of examining and approving fuel cost adjustment rate revisions. Since the record in this proceeding contains no evidence that any formal or informal approval procedure has been employed by the Commission, we are compelled to require the Commission to submit a written statement of the procedures it has followed in approving Petitioner's fuel cost adjustment rate revisions. We realize that this sort of *ad hoc* supplementation of the record is

---

"(b) No schedule of rates, tolls and charges of a public, municipally-owned or cooperatively-owned utility which includes or authorizes any changes in charges based upon costs is effective without the approval of the commission. Before the commission approves any changes in the schedule of rates, tolls and charges of an electric utility, which generates and sells electricity, based upon the cost of fuel to generate electricity or upon the cost of fuel included in the cost of purchased electricity, the public counselor shall examine the books and records of the public, municipally-owned or cooperatively-owned generating utility to determine the cost of fuel upon which the proposed changes are based. In addition, before such a fuel cost rate change becomes effective, the commission shall hold a summary hearing on the sole issue of the fuel adjustment charge. The public counselor shall conduct his review and make a report to the commission within twenty (20) days after the utility's request for the fuel cost adjustment is filed. The commission shall hold the summary hearing and issue its order within twenty [20] days after it receives the public counselor's report. The provisions of IC 1971, 8-1-2-39; IC 1971, 8-1-2-42 [this section]; IC 1971, 8-1-2-43; IC 1971, 8-1-2-54; IC 1971, 8-1-2-55; IC 1971, 8-1-2-56; IC 1971, 8-1-2-59; IC 1971, 8-1-2-60; and IC 1971, 8-1-2-61 concerning the filing, printing and changing of rate schedules and the time required for giving notice of hearing and requiring publication of notice does not apply to such a fuel adjustment clause or such a summary hearing.

"(c) Regardless of the pendency of any request for a fuel cost adjustment by any electric utility, the books and records pertaining to cost of fuel of all public, municipally-owned or cooperatively-owned utilities that generate electricity shall be examined by the public counselor not less often than quarterly and the books and records of all electric nongenerating public, municipally-owned or cooperatively-owned utilities shall be examined by the public counselor not less often than annually. The public counselor shall provide the commission with a report as to the examination of said books and records within a reasonable time following said examination. The public counselor may, if appropriate, request of the commission a reduction or elimination of the fuel cost adjustment. Upon such request, the commission shall hold a hearing forthwith in the manner provided in IC 1971, 8-1-2-58; IC 1971, 8-1-2-59; and IC 1971, 8-1-2-60.

somewhat unusual, but we feel it is the only practical method available for determining whether the Commission has discharged its statutory function. This procedure for remand to supplement the record is authorized by the statutory provisions governing judicial review of Commission decisions, and we are confident that the Commission will conduct these further proceedings in a manner which adequately protects the rights of the parties. IC 1971, 8-1-3-7 (Burns Code Ed.).

Affirmed in part and remanded with instructions for further proceedings consistent with this opinion.

Buchanan, J., concurs; Sullivan, P.J., concurs in part and dissents in part with opinion to follow.

OPINION CONCURRING IN PART AND DISSENTING IN PART

SULLIVAN, J.—The holdings of the majority opinion, handed down December 30, 1975, are contained in Parts III through VI thereof. It is to these parts that I address my separate opinion.

PRELIMINARY STATEMENT

I unhesitatingly concur in the thrust and tenor of the majority opinion which requires that in its Findings, the Public Service Commission must provide this court with sufficient tools for effective and meaningful judicial review. We of the judiciary are not blessed with the technical expertise expected of the Commission itself.

The majority ably points out that the legislature has not set forth guidelines to be followed by the Commission in approving or rejecting rate increase applications. A substantial portion of the Commission's adjudicative function has been committed to the Commission's discretion which must, however, be exercised within a sound framework of reasonable policy determinations. Herein lies the dilemma.

Since, unfortunately, the Commission, by legislative authorization, implication, or inaction, formulates its rate-

making policies on an ad hoc basis (Part II, p. 482), meaningful judicial review has been rendered difficult at best. If we are to decide whether a given rate increase is reasonable, we must require the Commission through its factual findings to disclose such reasonableness, at least prima facie. Rate making is a legislative, not a judicial function. *P.S.C.* v. *City of Indianapolis* (1956), 235 Ind. 70, at 81, 131 N.E.2d 308 at 312. And, we are not permitted to transgress upon the Commission's policy making prerogatives. Yet, we of the judiciary are required to review for legality.

It may be seriously questioned whether we may review the reasonableness of a rate increase order unless it is illegal or unconstitutionally confiscatory for we are precluded from striking down other legislative acts even if we deem them unreasonable. Be that as it may, the review for reasonableness is fixed in the case law of this state, as elsewhere. *P.S.C.* v. *City of Indianapolis, supra,* 235 Ind. at 84-85, 131 N.E.2d at 315-16; *P.S.C.* v. *City of LaPorte* (1935), 207 Ind. 462, 465, 193 N.E. 668. And that review includes whether the Commission considered or failed to consider elements or factors essential to a reasonable order. *P.S.C.* v. *City of Indianapolis, supra,* 235 Ind. at 84-85, 131 N.E.2d at 315-16.

What happens, however, if the reasonableness of a particular rate increase depends upon decisions which the Commission may term "policy"? May we review that policy or must we avoid such a clash and merely "rubber stamp" the decision of the Commission? It is my belief that we are required to review such "policy" if such review is essential for an enlightened determination as to the reasonableness of the rate established. I read the majority opinion to so hold. It states that "basic findings on all material issues" are necessary (Part II, p. 482). Material issues, in my estimation, include those involving "policy" determinations as well as those which are purely factual so long as reasonable policy application depends upon the presence or absence of certain varying factual considerations. We there-

fore must have a basis, whether it be evidentiary or a statement of policy reasons by the Commission, before we can determine, as we must, that the rate order is reasonable under the law.

It is my belief that the majority overly complicates our review by making extremely fine and somewhat inconsistent distinctions between "policy determinations" and "factual determinations" and by subjecting some certain Commission conclusions to a requirement that the findings contain basic facts supportive of the conclusion, while not subjecting other conclusions similar in nature to the same finding requirement.

In light of the above, I concur without comment or stated reservation as to Parts III, V (A), V (D) and VI; I concur with separate comment as herein contained as to Parts IV, V (C) and V(E) (2); and I dissent with respect to Parts V (B) and V (E) (1).

## IV

## PUBLIC NOTICE

I concur in the majority view that use of a rate increase petition caption as the requisite public notice is not per se unreasonable. I fear, however, that certain broad language used by my colleagues may be subjected to unwarranted construction. That language is as follows:

"A review of the statutory scheme clearly indicates that the case-by-case determination of what constitutes adequate public notice has been legislatively committed to the Commission's informed discretion. It is well established that an agency's interpretation of the statutory scheme it administers is entitled to judicial deference, especially when the legislative plan necessarily contemplates administrative rule elaboration." (p. 496).

Certainly, the "statutory scheme" which commits to the Commission's "informed discretion" the determination of "what constitutes adequate notice" is limited by the constitutional dictates of due process. The Commission may

correctly determine in its discretion that a particular public notice is adequate only if that notice is reasonably calculated to apprise the public of the matters to be considered. *Mullane* v. *Central Hanover Trust Co.* (1950), 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865. Subject to this due process caveat, I concur in Part IV of the majority opinion.

## V (B)

## ALLOCATION OF COMMON PLANT

"Used and useful" is a determination of ultimate fact. The facts which render the plant or its severable components "in service" and "reasonably necessary" and thus "used and useful" are basic facts which must be found by the Commission.

Part V (B) of the majority opinion recites that:

"In allocating 'common plant' between gas and electric operations, the Commission adopted a separation technique denominated as the 'supervised expense' method . . . Thus, the Commission found that approximately seventy-seven percent of the common plant was properly allocated to the jurisdictional electric rate base because seventy-seven percent of Petitioner's total expenses were incurred in its electric operations." (p. 502).

I locate in the record no such finding or findings. Nowhere in its findings does the Commission "adopt a separation technique" nor do the findings mention a 77% allocation to electric service. The sole finding with respect to common plant allocation is as follows:

". . . In addition, petitioner owns and operates common plant. facilities allocated to electric service plus materials and supplies properly included as a part of its utility plant in service."

The City in its brief has appropriately called attention to the absence of a definitive finding respecting common plant allocation.

To be sure, exhibits and testimony submitted by Petitioner, unobjected to by the City, utilized a "supervised expense"

allocation method and the evidence might well support an allocation percentage of 77% under that method. However, the Commission did not by its findings give us the review tools by which we might test the City's evidentiary attack, except as may be surmised from the Commission finding that "the fair value of Petitioner's electric utility properties used and useful . . . was not less than $125,334,454", or from its finding that "the net jurisdictional original cost of Petitioner's electric utility plant in service and used and useful for the convenience of the public (excluding the Broadway turbine plant, $4,814,511) amounted to $95,000,441. Contributions in aid of construction attributable to the aforesaid net jurisdictional plant amounted to $364,863 and are not to be included in Petitioner's net jurisdictional original cost for fair value purposes." The evidentiary Exhibit A-III, relied upon by the majority as the basis for the conclusion that the Commission did in fact adopt a 77% allocation does not lead inescapably to such conclusion. That the Commission did not adopt Exhibit A-III in toto is seen from the Commission's exclusion of the Broadway turbine plant and the exclusion of certain contributions in aid of construction. Even considering such exclusions or modifications to Exhibit A-III, it does not appear to me as a matter of arithmetic that the net jurisdictional original cost as found by the Commission comports with Exhibit A-III. The variance in bottom line figures may or may not be explained by other determinations made by the Commission. The Commission may in fact have adopted the 77% allocation. The important thing is that we cannot tell from the findings. We cannot even tell from a comparison of the findings with the exhibit for if the Commission accepted the 77% allocation figure of $2,435,655, the variance in net original cost must be explained elsewhere. Such explanation is not made even by slightest hint in the Commission's findings.

Surmise of this nature is the precise exercise in futility which we have sought to avoid for future utility rate reviews.

It is the very reason we require the Commission to make more complete findings with respect to other material issues. It is improper for us to make an independent review of the record to search for evidence to support findings which have never been made. Accordingly, I dissent from Part V (B) of the majority opinion and as we did with reference to the test year selected and adjustments made thereto, I would require the Commission to make specific findings with respect to common plant allocation as such is reflected in its "used and useful" determination.

## V (C)

## DEFERRED TAX EXPENSE RESERVE ACCOUNT

I concur in the holding of Part V (C) but find certain dictum therein to be unacceptable.

The majority has defined "rate base" as "that utility property employed in providing the public with the service for which rates are charged and *constitutes the investment upon which the 'return' is to be earned.*" (p. 479) (Emphasis supplied).

It appears incongruous to me that the majority contemplates, under some circumstances, inclusion of consumer contributed capital in the form of deferred tax reserves within the rate base but to "reduce to zero the rate of return allowed on plant constructed with the reserve funds". (p. 513). Likewise, the contemplation that the Commission might permit use of the funds as working capital, but "assigning the funds a zero cost of capital in computing the Petitioner's "fair rate of return." (p. 513).

Certainly, the reserve funds may be utilized by Petitioner for either purpose contemplated by the majority, i.e., for capital construction or as working capital, but should not be includable in the rate base.

I therefore disassociate myself from the dictum contained at p. 513 of the majority opinion and would simply preclude Peti-

tioner from utilizing deferred taxes as current expense unless such fund is excluded from the rate base. *City of Alton* v. *Commerce Commission* (1960), 19 Ill.2d 76, 165 N.E.2d 513. To do otherwise is to unnecessarily complicate the process. *See* Swiren, *Accelerated Depreciation Tax Benefits in Utility Rate Making*, 28 U. Chi. L. Rev. 629 at 649.

## V (E) (1)

### THE "IN SERVICE" REQUIREMENT

#### V (E) (2)

## THE "REASONABLY NECESSARY" REQUIREMENT

With reference to the "In Service" facet of the "Used and Useful" test, the majority considers inclusion of Petitioner's Ohio River facility. As the majority notes, the Commission found that the Ohio River plant was used and useful. Such is the *only* finding by the Commission with respect to the Ohio River plant.

The majority opinion at the outset categorized the "used and useful" determination to be one of ultimate fact (p. 486). Yet the naked conclusion with respect to the Ohio River facility is unsupported by findings of basic fact. I fail to see ho wwe might intelligently make judicial review without such findings. The "used and useful" conclusion is similar in this respect to the test year selection and adjustment treated in Part III wherein we required the Commission to articulate the policy and evidentiary basis for its ultimate fact conclusion. I would remand the "material issue" of "in service" as to the Ohio River Plant for findings of basic fact. Without such findings, we cannot truly address the City's evidentiary attack upon the ultimate conclusion.

The majority correctly, I believe, breaks the "used and useful" ultimate fact determination into two components—(1) in service and (2) reasonably necessary. Interspersed in the majority's consideration are words which denote the "in service" determination as one of "policy". Such designation

presumably accounts for the majority's acceptance of the Ohio River plant as "in service" without requisite findings of basic fact.

Inconsistently, however, when considering the "reasonably necessary" facet of the "used and useful" test, the majority holds a finding of basic fact actually made by the Commission with respect to the "reasonably necessary" sub-test, to be too imprecise to allow our review. (p. 519). Whether both the "in service" and "reasonably necessary" components are "policy" determinations or whether, as is more appropriate in my view, they are both factual determinations, they should receive like examination with respect to our judicial review. It is not enough to say that the ultimate fact of "used and useful" is adequately supported by naked conclusions of "in service" and "reasonably necessary" even though such conclusions since not ultimate may be disguised as a "finding of basic fact". *See* dissent to Part V (B), *supra*. Without regard to the semantics of "policy" versus "fact", I would require findings of basic fact to support not only the conclusion that the plant is "used and useful" but also to support the conclusions that the plant is in service and that it is reasonably necessary.

For these reasons, I concur in Part V (E) (2) which remands to the Commission for more specific findings with respect to "reasonably necessary". Such concurrence necessarily compels my dissent from Part V (E) (1).

NOTE.—Reported at 339 N.E.2d 562.