**OFFICE OF the PUBLIC COUNSELLOR, Charles W. Cole & Son, Inc. and David P. Schenkel, Appellants,**

v.

**INDIANA & MICHIGAN ELECTRIC COMPANY, Appellee.**

No. 2–1078A347.

Court of Appeals of Indiana, Third District.

Feb. 5, 1981.

Robert L. Thompson, Peebles, Thompson, Rogers & Hamilton, Richard C. Ver Wiebe; Ver Wiebe, Snow, Miller & Gray, Fort Wayne, John J. Metts, Deputy Public Counselor, Indianapolis, for appellants Charles W. Cole & Sons, Inc. and David P. Schenkel.

Thomas W. Yoder, Livingston, Dildine, Haynie & Yoder, Fort Wayne, for appellee; Edward J. Brady, American Electric Power Service Corp., New York City, of counsel.

GARRARD, Judge.

In January 1978, Indiana and Michigan Electric Company (I & M) filed a petition with the Public Service Commission of Indiana (Commission) for authority to increase its rates. After investigation and public hearings, the Commission granted a rate increase in September 1978. Intervenors, Charles W. Cole & Sons, Inc. and David P. Schenkel,[1] and the Office of the Public Counsellor (OPC) perfected this appeal by timely filing the record of proceedings and assignment of errors pursuant to IC 8–1–3–1 *et seq.*

Prior to considering the issues in this case, we refer the reader to *L. S. Ayres & Company v. Indianapolis Power & Light Company* (1976), 169 Ind.App. 652, 657–65, 351 N.E.2d 814, 819–21, wherein Judge Staton extensively reviewed the general rate

making process and the appropriate standard of judicial review of Commission decisions. Without duplicating that review, we will address ourselves to those portions of the discussion which are particularly relevant to this case.

Pursuant to IC 8–1–2–4, the Commission has the responsibility in every rate proceeding to determine a level of rates sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. In making this determination the Commission adopts a "test year," normally the most recent annual period for which complete financial data is available, and then calculates the utility's revenues, expenses and investment during that test period. The utility's revenues minus expenses constitute the earnings or the "return" that is available to be distributed to the utility's investors. Allowable costs include all types of operating expenses plus annual charges for depreciation and operating taxes. However, the Commission has broad discretion to disallow for rate making purposes any excessive or imprudent expenditures.

After the utility's existing level of "return" is established, the amount of investment in utility operations, the "rate base," is determined by adding the net investment in physical properties to an allowance for working capital. The "rate base" consists of that utility property used in providing the public with the service for which rates are charged and constitutes the investment upon which the "return" is to be earned. The rate base is usually defined as that property "used and useful" in rendering the particular utility service. IC 8–1–2–6.

After existing levels of "return" and "rate base" are determined, the Commission must decide whether the "rate of return," the ratio of return to rate base, is deficient, adequate or excessive. (*See L. S. Ayres, supra* at 820 for a discussion of how this determination is made.) This analysis lays

---

1. Intervenors, Cole and Schenkel, are represented jointly on appeal. They will thus be referred to together as "Intervenors."

the initial foundation for a decision as to a fair rate of return on utility assets. That determination, in turn, is the final issue necessary for resolution of the utility's future revenue requirement. Throughout the process, the Commission's primary objective is to reach a result that is equitable and that will permit continuity of utility services on a sound financial basis. IC 8–1–2–4.

■ As is evident from the above discussion, rate making is a detailed and highly technical process. It is primarily an exercise in informed regulatory judgment in which the legislature has invested the Commission with a great deal of discretion. OPC and Intervenors allege in their assignments of error that the Commission's order is contrary to law. Pursuant to IC 8–1–3–1, we are provided with a two-step standard of review:

"An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered."

At the first level of review, we require that the Commission's decision contain specific findings on all factual determinations material to its ultimate conclusions. *L. S. Ayres & Co., supra,* at 822; *City of Evansville v. Southern Indiana Gas & Electric Co.* (1975), 167 Ind.App. 472, 339 N.E.2d 562, 571. This first level may be termed a "question of law" as we ask whether the Board's ultimate conclusions may be "reasonably" inferred from its findings of basic facts. *Id.*

■ The second step in our review requires this court to inquire whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. *L. S. Ayres, supra; City of Evansville, supra.* After analyzing Indiana and federal judicial treatment of the substantial evidence test, the court stated in *L. S. Ayres, supra,* at 823:

"From a review of these authorities, we conclude that the substantial evidence standard authorizes a reviewing court to set aside Commission findings of fact when a review of the whole record clearly indicates that the agency's decision lacks a reasonably sound basis of evidentiary support. *See Universal Camera Corp. v. N.L.R.B.* (1951), 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456."

We note, in concluding, that a determination of "substantiality," unlike our usual appellate review, requires us to consider both the evidence in opposition to the challenged finding of basic fact as well as the evidence tending to support the finding. *Id.*

## I.

### *Consolidated v. Corporate Treatment*

Appellants contend that the Commission erred in treating I & M and its wholly-owned subsidiary, Indiana and Michigan Power Company (IMP), as a consolidated entity for rate making purposes.

■ IMP's principal assets are two nuclear power production units located in Bridgman, Michigan. IMP's total output of electric power is sold to I & M pursuant to a "Power Agreement." As this agreement involves the wholesale sale of electricity in interstate commerce, pursuant to the Federal Power Act, regulation of the rates contained therein is within the exclusive jurisdiction of the Federal Energy Regulatory Commission (FERC). 16 U.S.C. § 824 *et seq.*[2] This agreement may be described as a "cost of service contract." It provides that I & M is entitled to all of the energy generated by IMP's units, and, in return, I & M is obligated to compensate IMP for all costs of production of the purchased power, *including* a return on equity. A fair rate of return under the contract is computed by the FERC.

The Commission concluded that in determining I & M's rates it should treat I & M

2. There is no contention that the FERC does not have jurisdiction over the contract sales between I & M and IMP.

and IMP as a consolidated entity, combining all of IMP's assets, liabilities, revenues and expenses with those of I & M. Consistent with this approach, the Commission deleted the purchased power expense related to the contract with IMP from I & M's expenses. The Commission's conclusion was based upon its determination that IMP's nuclear plants are "vital to the rendering by I & M of adequate and reliable service to its retail customers in the State of Indiana." The Commission cited cases from other jurisdictions in which it has been held that the property of a subsidiary, "used and useful" in serving the customers of the parent should, when "wholly devoted" to such use, be included in the rate base of the parent.[3]

OPC and Intervenors do not contest the fact that IMP's units are "used and useful" in the servicing of Indiana customers. However, they argue that given the FERC's exclusive jurisdiction over the contract rates between I & M and IMP, the Commission is, as a matter of law, precluded from treating the two companies' assets on a consolidated basis. This argument is premised upon the fact that a fair rate of return on IMP assets has already been determined by the FERC and is incorporated in the contract sales price. To include IMP's assets in I & M's rate base would permit the Commission to determine a cost of service and return attributable to the cost of power sold by IMP which is other than the FERC established rate. This, it is argued, constitutes an impermissible collateral attack on the authority of the FERC.

We agree with OPC and Intervenors that the Commission erred as a matter of law in treating I & M and IMP as a consolidated entity for rate making purposes. The contractual and interstate nature of the relationship between the two companies is dispositive. Since I & M has chosen to provide power from the IMP nuclear production units to its customers indirectly through a contractual arrangement with IMP, rather than through actual ownership of the units itself, I & M has chosen to place its purchase arrangement with IMP within the jurisdiction of the FERC. The FERC and the Commission do not share concurrent jurisdiction with regard to the proper rate of return on IMP assets. Rather, the FERC has exclusive jurisdiction over the regulation of wholesale interstate power sales. Any attempt by the Commission to assign a rate of return attributable to IMP's cost of power clearly encroaches upon the FERC's duties and powers.

■ We conclude that I & M and IMP must be treated as separate entities for retail ratemaking purposes. We therefore remand this issue to the Commission for further proceedings not inconsistent with this opinion.

## II.

### Federal Income Tax Expense

Intervenors next contend that the Commission calculated I & M's federal income tax based upon an erroneous determination of I & M's effective tax rate with the result that ratepayers are being charged for a hypothetical tax expense rather than an expense actually incurred.

I & M is a wholly owned subsidiary of American Electric Power Co., Inc. (AEP) which also owns a number of other electric companies. In this rate making proceeding, I & M computed its federal income tax expense on the basis of what its tax liability would be as an individual taxable entity. However, it does not in actuality file an individual return. Instead it participates in a consolidated return with AEP and AEP's other subsidiaries pursuant to § 1501 et seq. of the Internal Revenue Code. I & M calculates its federal income tax and then presents its calculation to AEP who gathers the tax returns of all its subsidiaries, combines them, and files a single consolidated

---

**3.** *See, e. g., In re Southern Union Gas Company* (PVC Colo.1963), 50 P.U.R.3d 350; *City of Detroit v. Detroit Edison Co.* (PSC Mich.1933), 1933 (E) P.U.R. 193. However, none of the cases cited by the Commission deal with interstate, FERC-regulated subsidiary-parent relationships.

return. I & M reported no federal income tax on its individual return to AEP from 1974 through the test year, 1977. In addition, AEP has incurred no federal tax liability from 1971 through 1977. To conclude, I & M paid no *actual* federal income tax from 1974 through 1977, and the evidence indicates no change in this negative tax posture in the future.

The Commission, in its order, granted the rate increase requested, determining that I & M needed additional operating income of $21,939,205. It thus allowed an actual rate increase of $43,011,799 to take into consideration a 46.56% effective tax rate on incremental revenues.[4]

In *City of Muncie v. Public Service Commission* (1978), Ind.App., 378 N.E.2d 896, the Commission had permitted Muncie Water Works Company, a subsidiary of American Water Works Company, Inc., to compute its federal income tax expense at the statutory rate of 48% despite the fact that Muncie Water Works' effective rate was less than 48% due to its participation in a consolidated return with American Water Works and its other subsidiaries. This court stated that it was error for the Commission to arbitrarily allow Muncie Water Works' tax expense to be computed on that basis.

The court held that where a subsidiary files a consolidated return with a parent company and its other subsidiaries, the Commission must compute the subsidiary's tax expense upon the basis of its actual tax liability rather than employ a hypothetical figure based upon a fictitious separate tax return. In so holding, the court stated:

"Just as the Commission in *Indiana Bell* could not arbitrarily disallow taxes actually paid under a capital structure which did not exist, in this case the Commission cannot arbitrarily allow a tax expense computed on the basis of a separate tax return when such a return was not actually filed. This does not mean that the expenses and revenues of affiliated companies must be attributed to Petitioner for rate-making purposes. Rather, *it means that some determination must be made as to the tax savings accruing* to Petitioner as a result of its participation in the filing of a consolidated federal income tax return. In this matter, a more accurate computation of Petitioner's actual federal income tax liability can be made." (our emphasis)

*Id.* at 898–99.

*City of Muncie* did not direct the Commission as to how it was to assess the effects of filing a consolidated return nor did the court state what recognition, if any, should be accorded the various tax savings accruing to a subsidiary by reason of its participation in a consolidated return. Rather, the court emphasized that it was not our function to make that initial determination. In discussing the role of the Commission, the court stated:

"Furthermore, the determination of such a figure may well involve issues of regulatory policy. It is not the duty of this court to sift and weigh evidence, and then interpret that result through the application of regulatory policy. Rather, this procedure has been consigned to the discretion and expertise of the Commission."

*Id.* at 900.

A year after the decision in *City of Muncie*, this court decided *Citizens Energy Coalition v. Indiana & Michigan Electric Co.* (1979), Ind.App., 396 N.E.2d 441. *Citizens Energy Coalition* involved a 1976 rate increase request by I & M. Although I & M

---

**4.** The Commission's Order merely states that it is allowing additional revenues of $43,011,799 with a resulting annual operating income available for return to IME of $101,743,662. The Order does not state what amount of this additional figure is allocated for tax expense. However, as the Commission concluded that I & M's test year revenues were $79,804,457, it follows that $21,939,205 ($101,743,662 – 79,-804,457) constitutes the incremental income available for return to I & M with the remainder of the $43,011,799 figure, that is $22,072,-594, for tax expense. This does not equate mathematically as 46.56% of $43,011,799 is approximately $20,000,000. Nevertheless, the Commission has allocated approximately $20 million for tax expense where no actual liability is incurred.

participated in a consolidated return under the same facts as the instant case, the Commission had calculated its federal tax expense using the statutory rate rather than the actual or effective tax rate. Following the holding in *City of Muncie*, we held this was impermissible. In stating that the Commission must make some determination of I & M's actual tax expense, the court analogized the inclusion of the cost of federal taxes as an expense with the inclusion of the cost of fuel, labor and repair:

"The purpose of the inclusion of federal income taxes as a cost is the same as the inclusion of the cost of fuel, repair, labor or any other cost. It is money that must be paid out and must be considered in arriving at the end figure, that is, a fair rate of return to investors. It would be facetious to assume that the Commission, or this court, would approve the inclusion of a figure for labor, for example, in the amount of $21,435,299 if accountants testified that no such expense existed in fact and was not known, fixed and measurable within one year. In this case Petitioner's own accountant did in fact testify that no tax expense was foreseeable.

In the instant case the Commission, attempting to comport with the court's decision in *City of Muncie*, calculated I & M's allowance for federal income tax on a separate return basis *as adjusted* for parent company tax loss benefits.[5] The Commis-

sion also determined I & M's actual or effective tax rate to be 46.56%.[6]

The basic issue presented by this case is the *extent* of recognition that must be given by the Commission to the fact that a company participates in a consolidated return. While the Commission took parent tax loss into consideration in assessing I & M's tax expense on a separate return basis, Intervenors urge the only real way to assess I & M's tax expense is to calculate the company's expenditure and tax rate under the consolidated return and not on a single company stand-alone basis.

Under the consolidated method, a subsidiary is allocated its share of all available *system* current and carry-forward deductions and credits. Under the single company stand-alone method, the subsidiary's tax expense does not reflect these benefits which it in reality receives. In the instant case this result was partially ameliorated by the Commission's inclusion of some parent tax loss in I & M's tax expense; however, the Commission gave no recognition to the effect of tax benefits generated by AEP system companies other than the parent.[7]

In addition, even excluding any potential *system* generated benefits, Intervenors argue that the use of a current year single company stand-alone basis ignores I & M's internally generated tax loss and

**5.** American Electric Power Company has substantially no taxable income. However, in order to finance its operation, AEP has had substantial short-term debt outstanding from time to time which periodically is permanently financed from new common equity offerings. It is largely the interest expense on such short-term debt which creates the parent's tax loss. The parent company tax loss serves to reduce the actual tax liability of the consolidated group in which I & M participates. For rate making purposes, a total parent tax loss of $1,235,000 was used in the computation of I & M's federal income taxes.

**6.** The Commission's Order is unclear as to how it arrived at 46.56% as the effective tax rate. Various figures were introduced by both sides, including the rates of 0, 15, 43.9 and 47.3%. The only reference to the manner in which the 46.56% figure was determined is found in the Commission's discussion of I & M's initial reve-

nue increase request of $93,412,620, of which $41,513,133 was for federal taxes. There is no determination of the effective tax rate for the level of incremental revenue actually approved. That the Commission must make some determination of the actual effective rate is beyond question. *United Telephone Co. of Indiana v. Public Service Commission* (1980), Ind.App., 402 N.E.2d 1013, 1016.

**7.** The Commission, in its order, stated that not to eliminate tax losses of other companies would be tantamount to destroying normalization in Indiana. To the extent that the benefits of book/tax-timing differences which are flowed through in other jurisdictions are included in an Indiana cost of service, this would have the same effect as practicing flow-through accounting for such items in Indiana. (*See* Sec. III, *infra*, for a more complete discussion of normalization accounting.)

credit carry-forwards. In evaluating a utility's tax expense on a current test year basis, the Commission does not consider tax loss and credit carry-forwards which are available from past years to offset tax expense in the test year, or those which will be generated in the future which will offset tax expense in later years. This topic was partially addressed by the court in *Citizens Energy Coalition, supra,* 396 N.E.2d at 446.

"Petitioner attempts to justify such inclusion of taxes as an expense on the ground that the absence of tax in the test year, and in future years, grows out of losses in past years. It is the current and future tax that is the cost, or lack of cost, not the old tax, or old loss. The mere fact that the Internal Revenue Code allows Petitioner to spread its loss for tax purposes over several years does not alter the fact that there is no tax cost in the test year, and tax is not known, fixed and measurable within one year from the end of the test year."

A more thorough discussion of the use of tax carry-forwards in determining a utility's tax expense may be found in *Consolidated Edison Co. of New York v. New York State Public Service Commission* (Sup.Ct. 1976), 53 App.Div.2d 131, 385 N.Y.S.2d 209, where the court stated:

"While the carry-forwards may have served to reduce petitioner's rate increases in prior years, nevertheless, it is not disputed that these carry-forwards of past investment credits, net operating losses, and charitable contribution deductions are available to reduce petitioner's tax liability on its earnings under the new rates. Had the Commission ignored them in the present case, it would have resulted in an unrealistic and high tax allowance, and in turn, in a higher rate increase than would otherwise be required for petitioner to obtain a fair and reasonable return on its investment. Rates approved by the Commission should consist only of that which is just and reasonable, and should not include an ad-

ditional amount representing a savings in taxes, as urged by petitioner."
385 N.Y.S.2d 210.

The Commission's Order does not state why it did not consider tax carry-forwards when evaluating I & M's tax expense. However, general rate making principles provide that rates are set *prospectively* at a level which will cover expenses associated with revenue produced. I & M cites the opinions of other state public utility commissions for this proposition, as well as IC 8–1–2–68 which provides that the Commission shall establish rates to be followed in the future.

The question facing us concerns the extent to which this court should involve itself in directing the Commission in the performance of its duties. While *City of Muncie* and *Citizens Energy Coalition* stress that tax expense must be based upon an actual rather than hypothetical figure, both cases leave the actual determination to the discretion of the Commission. These cases implicitly recognize that the ability of this court to fully apply the principles of utility accounting, and the intricacies of rate base evaluation, is limited. On the other hand, we cannot stand behind the guise of Commission discretion as an avoidance of our responsibility of assuring the citizens of Indiana that utility charges imposed upon them are "reasonable and just." IC 8–1–2–4.

■ *City of Muncie* and *Citizens Energy Coalition* require that the Commission make "*some* determination" of the tax effects accruing to a utility as a result of participation in a consolidated return. Given that there is a legitimate question as to the potential for distorting normalization in Indiana if the Commission were to include AEP *system*-generated tax benefits in its determination of I & M's tax expense (*see* n. 7, *supra*), the Commission's decision to only consider the effect of parent tax loss on I & M's tax expense is clearly reasonable.

Of note, in *United Telephone Co. of Indiana v. PSC* (1980), Ind.App., 402 N.E.2d 1013, this court concluded that the Commis-

sion had acted reasonably in assigning a portion of a parent company's debt deduction to its subsidiary in computing the latter's tax expense on a separate return basis. The court, however, remanded the case to the Commission for a determination of the utility's actual effective tax rate.

Intervenors urge that *City of Muncie* stands for the much broader proposition that tax expense must be computed upon the basis of *actual* expenditure, rather than some hypothetical figure. The evidence is uncontroverted that I & M had incurred no federal tax liability for at least three years prior to this proceeding, and the utility anticipates this "negative" posture will continue in the future. Thus, we could take the position that tax expense may only be based upon actual expenditure, and where, for whatever reason, there has been no liability, there can be no tax expense computed into the utility's revenue requirement.

One reason for I & M's negative tax status is their participation in a consolidated return and the availability of all system deductions, credits and tax carry-forwards in computing AEP's taxes. *City of Muncie* specifically states that a more realistic assessment of a subsidiary's tax expense need not "mean that the expenses and revenues of affiliated companies must be attributed to Petitioner for rate-making purposes." 378 N.E.2d at 899. Given the possible effects on normalization in Indiana, it is probably not reasonable to require the Commission to consider the tax benefits flowing from other AEP system companies.

However, as Intervenors point out in their brief, even if I & M filed an individual tax return, it would still not be incurring any tax expense due to the large amount of tax deductions, credits and carry-forwards which its own operations have generated. As discussed previously, in determining its test year tax expense, I & M only considered parent tax loss and *current* deductions and credits available in the test year. It did not consider available tax carry-forwards which served in reality to substantially reduce actual test year tax expense.

■ It appears to us manifestly unreasonable to allow the inclusion of approximately $20 million in tax expense in the computation of I & M's revenue requirement where no such expense is ever actually incurred. We recognize, however, that it goes beyond our function to attempt to determine what that expense should be or what the tax rate shall be. These are determinations for the Commission. Part of the problem with reviewing the Commission's actions in this case is that it has not fully stated what amount of the incremental revenue approved is for tax expense, how the tax expense figure was computed, or how the effective tax rate of 46.56% was reached.

In addition, the Commission's Order does not specifically address the question of why *any* tax expense is calculated where I & M does not actually incur a liability. It would appear that the Commission justified inclusion of tax expense in the computation because of the normalization procedures allowed. While 90% of I & M's tax expense was offset by investment credit in the test year, so that only 10% was actually due that year (which 10% was offset by carry-forwards), because of normalization, booked tax expense reflects a larger deferred tax figure. That larger figure is apparently then used as I & M's tax expense for rate making on the theory that the amount merely represents deferred taxes and not a tax savings. Therefore, much of the question as to whether the tax expense allowed by the Commission is reasonable is tied to the basic concept of and premises behind normalization. OPC and Intervenors argue that the reason no tax expense is actually incurred is because I & M is continually growing and thereby generating more investment credit with the result that taxes are consistently deferred and never actually paid due to constant generation of credits and carry-forwards.

We recognize that it is not the function of this court to substitute our discretion for that reposed in the Commission. We additionally acknowledge that an acceptable tax accounting or rate making procedure will not always function in classic fashion.

However, as a reviewing body we may not ignore the *actual* operation of the procedures employed. This is especially true where, as here, the procedures have included a tax expense in I & M's revenues which has been collected from ratepayers for the past several years but not paid to the Internal Revenue Service, and the company's own witnesses have testified that because of I & M's construction program and the consequent generation of credits and loss carry-forwards, I & M will probably incur no actual tax liability in the near future. Indeed at the close of 1976, I & M had unused investment credits totaling nearly $130 million to offset federal income taxes through 1983. At minimum, *City of Muncie* requires the Commission to explain by appropriate findings why such allowances are representative of I & M's "actual tax liability" and do not instead constitute a hypothetical expense. In addition, the Commission should set forth the amount of allowed incremental revenues for tax expense and how it arrived at the appropriate effective tax rate.

### III.

### *Expanded Normalization*

OPC and Intervenors next urge that the Commission erred in permitting I & M to normalize certain book/tax-timing differences for the purposes of computing its federal income tax expense.

Normalization is a form of accrual accounting by which tax expense is recorded in the proper periods even though actual cash payment will occur at some later point. Normalization is employed where a utility has taken advantage of certain tax options, such as accelerated depreciation rates and the investment tax credit, which operate to reduce the taxpayer's federal tax expense during the first years of its plant's useful life, and to increase tax expense in later years.

For example, Sec. 167 of the Internal Revenue Code permits accelerated depreciation of the cost of utility plant with the result that more depreciation expense is generated in the early years of the proper-

ty's useful life, and less in later years, than would be generated by traditional straight-line depreciation methods. 26 U.S.C. § 167. Under normalization, the utility claims as a current expense not only the federal taxes actually paid, but also an amount equal to the difference between the taxes actually paid and the taxes which would have been due if the utility had adopted straight-line depreciation.

The difference between the actual taxes paid by the utility and the larger hypothetical amount for taxes charged to the ratepayers is accumulated in a "deferred tax" reserve account. Theoretically, in later years when actual tax expense increases and exceeds the recovery from customers (turn-around), this accumulated reserve is applied to reduce the recorded tax expense accordingly. Normalization accounting thus permits a company to spread its tax benefits equally over each year in which an asset is in service. Consequently, present and future utility customers share the tax benefits equally.

The logical basis for regulatory application of the concept of normalization rests on the essential assumption that the tax savings generated by the expensing or accelerated tax amortization of the items involved results in a deferral of tax liability which will have to be paid later, rather than a permanent tax savings. OPC and Intervenors urge that the realities of the public utility industry do not support this assumption. They contend that where a utility maintains a stable or growing plant, normalization results in a tax savings as depreciation on older assets at a lower booked expense level is counterbalanced by above normal depreciation on new assets. Therefore, it never becomes necessary to resort to the funds in the reserve account as future tax benefits will more than offset lower depreciation on older assets. The end result is that the taxpayers are charged for an expense which is never actually incurred.

The above argument in opposition to normalization is not a new one. A number of courts and public utility commissions have

agreed with this position and denied utilities the use of normalization procedures. *See generally, Alabama-Tennessee Natural Gas Co. v. Federal Power Commission* (5th Cir. 1966), 359 F.2d 318, cert. denied 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78; *Central Maine Power Co. v. Public Utilities Comm.* (Maine 1978), 382 A.2d 302; *City of Los Angeles v. Public Utilities Comm.* (1975), 125 Cal.Rptr. 779, 15 Cal.3d 680, 542 P.2d 1371; *Re Iowa Power & Light Co.* (Iowa State Commerce Comm. 1977), 20 P.U.R. 4th 397.

The Indiana position on the use of normalization was stated by our Supreme Court in *Boone County REMC v. Public Service Comm.* (1959), 239 Ind. 525, 159 N.E.2d 121. The Court upheld the authority of the Commission to permit normalized treatment of accelerated depreciation expense.[8] In so doing, the Court held:

> "The right and power of the Commission to authorize an accounting system under which reserves are set up for future tax increases, losses or contingencies is an administrative matter and, so long as such procedure is within reason and prudence, the trial court has no right to interfere. The Commission is fully authorized by statute to determine the accounting system and procedure to be followed. This includes specifically reserves for, and rates of depreciation, and the use of such reserves. [citation omitted] We judicially know that good accounting practices require reserves for losses and contingencies which accrue in the future because of current operations."

229 Ind. at 536, 159 N.E.2d at 126.

Following *Boone County REMC* we have left the determination of the need for normalization procedures to the informed discretion of the Commission. Where there is adequate evidence to support the Commission's decision that normalization is necessary, we have upheld that determination. *See Bethlehem Steel v. Northern Indiana Public Service Co.* (1979), Ind.App., 397 N.E.2d 623 (authorizing normalized treatment of the cost of long-term construction projects).

In the instant case, I & M sought, and was granted by the Commission, the right to expand its normalization procedures to reflect the normalization of income tax benefits associated with book/tax timing differences of certain items which were, prior to this proceeding, treated on a "flow-through" basis.[9] Under "flow-through" treatment, tax expense is calculated in terms of what the utility actually pays and no deferred tax reserve is accumulated.

OPC and Intervenors argue that the approval of expanded normalization is improper where a permanent tax savings, rather than a tax deferral, is present, and no external requirement of normalization exists. The approval of normalization under these circumstances, they contend, is not reasonably related and is contrary to the Commission's duty to determine rates which are reasonable and just, in that such application results in rates which generate revenues in excess of the utility's actual costs of service plus a fair rate of return.

■ We do not read *Boone County REMC* as a mandate that normalization is the proper treatment of all book/tax timing differences. Rather, it stands for the proposition that the Commission has the power, within its informed discretion, to authorize an accounting system which best reflects the financial needs of the utility.

---

8. Sec. 167(e) of the Internal Revenue Code now conditions availability of accelerated depreciation rates upon normalized regulatory treatment of a utility's depreciation expense. 26 U.S.C. § 167(e). The same is true with respect to the availability of the investment tax credit. Sec. 46(f)(2) of the IRC requires a utility to amortize the tax saving obtained by the credit over the useful life of its depreciable plant. 26 U.S.C. § 46(f)(2).

9. I & M was granted permission to normalize taxes capitalized, pensions capitalized, ADR repair allowance, cost of pollution control facilities and the interest component of the Allowance for Funds Used During Construction.

   Pursuant to the Internal Revenue Code, *see* n. 8, *supra*, I & M had been normalizing its treatment of accelerated depreciation and the investment tax credit. There is clearly no question that the Commission may authorize normalization procedures with regard to their use.

OPC and Intervenors present persuasive evidence that in reality I & M's deferred tax reserve account may never be resorted to for payment of future taxes, and thus normalization has the potential for being a tax savings device. However, the task of evaluating a utility's financial condition belongs to the Commission and not the appellate court. It is not our role to reweigh and reassess the evidence. Pursuant to *Boone County REMC,* the decision to allow normalization is a policy determination best suited to the expertise of the Commission. The Commission's Order in this case extensively discusses its reasons for approving expanded normalization procedures.[10] We find this discussion persuasive and sufficient, in light of our standard of review, to support the Commission's ultimate conclusion that normalization is a proper and necessary accounting technique for utility rate making purposes.

■ We therefore conclude that the Commission did not err in granting I & M permission to expand its normalization

treatment of certain book/tax-timing differences.

## IV.

### Job Development Investment Tax Credit

OPC argues that the Commission erred in including I & M's accumulated job development investment tax credit (JDITC) reserve account in its capital structure at the cost of equity capital.[11]

■ The JDITC for utilities was authorized by the Revenue Act of 1971 and was extended by Congress pursuant to the Tax Reduction Act of 1975. 26 U.S.C. § 46(f). Given the difficulties utilities had been facing in securing capital and the increasing competition they were encountering from other sectors of industry, it was the intent of Congress that utility investment be stimulated with both the utility's investors and its ratepayers sharing in the benefits of the credit. Thus, the credit was not to be used simply to reduce the utility's customers' costs. *See generally S.Rep.No.92–437,* 92nd Cong., 1st Sess. 36 (1971), U.S.Code Cong. &

---

**10.** The Commission's Order states:

"Moreover as the record in this case shows, Petitioner is under instruction from this Commission to begin to follow the interperiod tax allocation as described by the Commission in its decision of October 6, 1975, in *Northern Indiana Public Service Company,* Cause No. 33920.

In that case we determined:

1. The issue of normalization is in fact a policy decision for the Commission.

2. Interperiod tax allocation is properly recognized for items involving book/tax timing differences.

3. Comprehensive interperiod income tax allocation is a principal that is supported in accounting theory and practice as well as by the Securities and Exchange Commission and the Federal Energy Regulatory Commission.

4. In approving for NIPSCO the use of comprehensive interperiod tax allocation we considered and took into account:

(a) *the present energy shortage*

(b) the constant increase in the demand for electric energy

(c) the resulting required plant expansion of generating capacity

(d) the large sums of capital required to finance such plant expansion

(e) the inflation that we have experienced in the immediate past and are continuing to experience

(f) the resulting difficulties in raising required capital to provide funds for necessary construction of additional plant

(g) the increasing cost of capital

(h) the resulting possibility of cut-backs in necessary construction.

"5. The use of comprehensive interperiod income tax allocation or normalization for rate-making purposes has the following advantages:

(a) increased internal cash flow

(b) resulting decrease in outside capital requirements

(c) improved coverage of fixed charges ratios

(d) resulting reduction in cost of capital.

6. The increasing demand and need for electric energy in Indiana can be supplied only if the electric industry can grow by construction of additional generating facilities. The acceptance of comprehensive interperiod income tax allocation for rate-making purposes for the reasons set out above will contribute to and be advantageous in providing such required growth and thus will be beneficial and in the best public interest."

**11.** The accumulated reserve account of unamortized investment credit constitutes a source of capital which is utilized as working capital by the utility. The issue here is whether these funds should be included in I & M's capital structure for purposes of determining a proper rate of return on equity.

Admin.News 1971, pp. 1825, 1918, 1972–1 C.B. 578; *H.R.Rep.No.94–19*, 94th Cong., 1st Sess. 12 (1975), 1975–1 C.B. 574.

In order to effectuate this intent, the statute provides three basic accounting options available to public utilities in their use of the credit. I & M elected to employ the second of these options, a normalization technique designated as the "special rule for ratable flow-through." 26 U.S.C. § 46(f)(2).[12] This section provides that the utility adopt an accounting procedure which "flows-through" the credit to income no more rapidly than ratably over the useful life of the property, with no adjustment to reduce the rate base. Under Section 46(f)(2) a utility will lose its JDITC for income tax purposes if the credit is flowed-through to income more rapidly than ratably over the useful life of the property, or if there is any reduction in rate base by reason of the accounting treatment afforded the credit.

I & M normalizes the effect of its JDITC so as to satisfy the first requirement under Sec. 46(f)(2); that the credit be flowed-through to income ratably over the life of the property. Whether the unamortized funds should be included in I & M's capital structure goes to the second requirement, that no reduction in rate base occur from use of the credit.

The Commission based its determination that I & M's accumulated JDITC should be included in the cost of capital computation at the equity rate upon several Internal Revenue Service Informational Letters issued in 1976 and early 1977.[13] These letters were written in response to inquiries regarding the proper accounting treatment of unamortized JDITC under Section 46(f)(2). Although the letters are not in the record, the Commission's Order quotes from one of them in discussing the policy concerns behind including the deferred reserve account in the utility's capital structure.[14]

"*Accordingly, in determining the overall cost of capital of a utility for rate-making purposes, deferred investment tax credits are properly to be included and assigned a rate not less than that considered applicable to common equity.* It follows that the unamortized investment credit, or that portion of the credit which has not yet been flowed through to income, is appropriately to be included in the total capital of a utility on which a rate of return is to be allowed. This procedure implements the intent of the Congress that the benefits of the credit be shared between investors and customers. While a utility would be permitted to earn a return on the unamortized investment credit, the ratable amortization of the credit reflected in the utility's cost of service would result in increased revenue for rate-making purposes with a corresponding reduction in the utility's rates." (Emphasis supplied).

---

**12.** 26 U.S.C. § 46(f)(2) provides:

"(2) Special rule for ratable flow-through

If the taxpayer makes an election under this paragraph within 90 days after the date of the enactment of this paragraph in the manner prescribed by the Secretary, paragraph (1) shall not apply, but no credit shall be allowed by section 38 with respect to any property described in section 50 which is public utility property (as defined in paragraph (5)) of the taxpayer—

"(A) Cost of service reduction

If the taxpayer's cost of service for rate-making purposes or in its regulated books of account is reduced by more than a ratable portion of the credit allowable by section 38 (determined without regard to this subsection), or

(B) Rate base reduction

If the base to which the taxpayer's rate of return for ratemaking purposes is applied is reduced by reason of any portion of the credit allowable by section 38 (determined without regard to this subsection)."

**13.** OPC initially argues that the Commission was in error in basing its order upon the letters as they were never admitted into evidence. However, this error was not preserved for appeal as it was not included in the OPC's Assignment of Errors. TR. 59(D)(2).

**14.** Of note, Section 6110(j)(3) of the Internal Revenue Code, adopted in the Tax Reform Act of 1976, provides that a written IRS determination may not be used or cited as precedent. 26 U.S.C. § 6110. An IRS letter is not an "official interpretation" by the IRS, and it is not designed to apply authoritative principles or statutory requirements to specific factual situations. *Re Carolina Power & Light Co.* (FERC 1978), 26 P.U.R. 4th 75.

In the interim between the Commission handing down its order and our consideration of this appeal, the IRS has issued its Final Regulations governing Section 46(f)(2), 26 C.F.R. § 146–6 (1979). IRS Regulation § 1.46–6(b)(3)(ii) states:

"(ii) In determining whether, or to what extent, a credit has been used to reduce rate base, reference shall be made to any accounting treatment that affects rate base. In addition, in those cases in which the rate of return is based on the taxpayer's cost of capital, reference shall be made to any accounting treatment that affects the permitted return on investment by treating the credit in any way other than as though it were capital supplied by common shareholders to which a 'cost of capital' rate is assigned that is not less than the taxpayer's overall cost of capital rate (determined without regard to the credit). What is the overall cost of capital rate depends upon the practice of the regulatory body. Thus, for example, an overall cost of capital rate may be a rate determined on the basis of an average, or weighted average, of the costs of capital provided by common shareholders, preferred shareholders and creditors."

These regulations provide that one must include the unamortized funds in the utility's capital structure, but they may be assigned the *overall* cost of capital rate, and thus need not be included at the common equity cost of capital as the Commission determined in this case.

Commissioner Powers dissented from the Commission's Order on this issue, concluding that this court's decision in *City of Evansville, supra,* is controlling here. In *City of Evansville,* Judge Staton discussed the nature of the funds contained in deferred tax reserve accounts. 339 N.E.2d at 585–86. Since these funds represent moneys obtained from customers, they constitute "consumer contributed" capital which is utilized by I & M as working capital free of any charges for interest and dividends. Under traditional regulatory theory, the company's investors, not its customers, must contribute the utility's capital upon which the consumer then pays a fair return. Therefore, the court concluded that it was fundamentally unreasonable to allow a utility to obtain a return on capital not advanced by its investors. Since *City of Evansville,* the Commission has been including deferred tax reserve accounts in a utility's capital structure at a zero cost of capital. The effect of this treatment is that for rate making purposes, the utility is not entitled to earn a fair rate of return on these funds.

The JDITC is a special credit available only to utilities under 26 U.S.C. § 46(f). It has been in effect since 1971. However, the appropriate treatment of accumulated JDITC funds, insofar as rate making is concerned, has not been completely delineated either judicially or by official IRS rulings. Although the rationale in *City of Evansville* would appear to encompass unamortized JDITC funds, the Indiana courts have not considered the § 46(f) credit and its statutory requirements. It is important to remember that the JDITC is a special public utility credit, and its provisions contain certain requirements not found in other tax benefits available to utilities, the use of which also create deferred tax reserve accounts. Deferred JDITC funds would appear to require a different treatment than other deferred tax accounts, such as those created by the normalization of accelerated depreciation.

In *Re Carolina Power & Light Co.* (FERC 1978), 26 P.U.R. 4th 75, the FERC concluded that § 46(f) requires inclusion of funds in a utility's capital structure with a return allowable as measured by the *overall* rate of return and not that of the higher common equity rate of return. This approach is consistent with the IRS' Final Regulations as cited above. The Colorado Supreme Court held that its Public Utilities Commission erred in including JDITC in a utility's capital assets at a zero rate of return. *Colorado Municipal League v. Public Utilities Commission* (1979), 197 Colo. 106, 591 P.2d 577. The court concluded that federal law requires that the tax credit be assigned a rate of return comparable to that assigned to capital contributed by investors, or a reduction in the rate base is deemed to occur.

A general review of JDITC treatment in other jurisdictions suggests that public utility commissions have varied in their treatment of the unamortized credit. This variance in all likelihood results from the general uncertainty in the law. The statute and regulations clearly state that the unamortized funds must be included in the utility's capital structure and assigned a cost of capital rate. However, many jurisdictions regard deferred tax reserve funds in much the same light as the *City of Evansville* rationale, and have therefore either excluded the funds from a utility's capital structure or assigned them a zero cost of capital. Although it is unclear, it would appear many commissions treat JDITC funds in the same fashion as other deferred tax reserve accounts and, as OPC argues, the IRS has yet to deny the credit to any utility.

 We conclude from the foregoing that the unamortized portion of JDITC funds must be included in a utility's capital structure and assigned a cost of capital rate not less than the utility's overall cost of capital. Toward this end, the Commission's decision to include I & M's JDITC account in the utility's capital structure at the cost of common equity is consistent with Section 46(f) of the Internal Revenue Code and the IRS' Final Regulations. The Commission's decision should therefore be upheld.

## V.

### Out-of-Period Adjustments

 OPC contends the Commission, allegedly in violation of its pre-hearing order, erred in admitting into the record data concerning events which occurred beyond the test year period. OPC has not preserved this issue for appeal as it failed to allege this error in its Assignment of Errors. TR. 59(D)(2).

 We note, however, that the selection of a test year and the adoption of an adjustment method involve complex determinations best suited to the expertise of the Commission. While the Commission's pre-hearing order did not specifically provide for out-of-period adjustments, utilization of an adjustment method to account for

changed conditions not reflected in test year data is common procedure in utility rate making proceedings. *See City of Evansville, supra,* 339 N.E.2d at 569. We cannot say the Commission's actions were unreasonable under the circumstances. *Capital Improvement Board of Managers of Marion County (Convention Center) v. Public Service Commission* (1978), Ind.App., 375 N.E.2d 616.

## VI.

### Hearsay Testimony

 OPC finally urges that the Commission erred in admitting into evidence allegedly hearsay testimony regarding certain depreciation rates at issue in this proceeding. However, nothing is presented for our review since, again, no allegation of this error was raised in the Assignment of Errors pursuant to TR. 59(D)(2).

Affirmed in part, Reversed in part, and Remanded for further proceedings consistent herewith.

HOFFMAN, P. J., and STATON, J., concur.